BACHARACH, Circuit-Judge.
This case involves the authority of the U.S. Army Corps of Engineers to issue nationwide permits under § 404(e) of the Clean Water Act. These permits authorize activities involving discharge of dredged or fill material in U.S. waters and wetlands. See 33 U.S.C. § 1344(e) (2012). Exercising this permitting authority, the Corps issued Nationwide Permit 12, which allows anyone to construct utility lines in. U.S. waters “provided the activity does not result in the loss of greater than/6 acre of [U.S. waters] for each single and complete project.” Reissuance of Nationwide Permits, 77 Fed.Reg. 10,184, 10,271 (Feb. 21, 2012).[2]
TransCanada Corporation proposed to rely on the nationwide permit to build an oil pipeline, the Gulf Coast Pipeline,[3] which would run approximately 485 miles and cross over 2,000 waterways. The Corps issued letters verifying that Nationwide Permit 12 would cover the proposed construction. Shortly thereafter, TransCana-da began constructing the pipeline, which has since been completed and is currently transporting oil.
Three environmental groups (Sierra Club, Inc.; Clean Energy Future Oklahoma; and East Texas Sub Regional Planning Commission) have challenged the validity of the nationwide permit and verification letters. The district court rejected these challenges and entered judgment for the defendants.
In this appeal, we address and reject three sets of claims:
• Claims Involving the National Environmental Policy Act (NEPA): The environmental groups argue that the Corps violated NEPA by issuing the nationwide permit without considering the risk of oil spills and the cumulative environmental impacts of pipelines. These arguments are waived.
The environmental groups also argue that the Corps issued the verification letters without conducting a NEPA analysis. We conclude that this analysis was not necessary at the verification stage.
• Claims Involving the Clean Water Act: According to the environmental groups, the nationwide permit violates *1047 the Clean Water Act by (1) effectively authorizing activities with more-than-minimal environmental impacts and (2) unlawfully deferring a portion of the minimal-impacts analysis to project-level personnel. We reject both arguments. The environmental groups have not shown that the permit ' authorizes • activities with more-than-minimal impacts, and the Corps has permissibly interpreted the statute to allow partial deferral of its minimal-impacts analysis.
• Claims Involving the Nationwide Permit 12: Finally, the environmental groups contend that the Corps incorrectly verified compliance with the nationwide permit without analyzing the cumulative effects or documenting the analysis of cumulative effects. We reject this contention. Corps officials did not need to include a cumulative-effects analysis in the letters, and the record shows that officials conducted the necessary analysis.
Based on our conclusions, we affirm the entry of judgment in favor of the defendants.[4]
I. Stándard of Review
We review the challenges under the Administrative Procedure Act (APA). See 5 U.S.C. §§ 701-706 (2012). In applying this standard, we will set aside agency actions that are “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A) (2012).
Review under the APA is narrow: “[T]he agency need only demonstrate that it considered relevant factors and alternatives ... and that the choice it made was reasonable based on that consideration.” Mt. Evans Co. v. Madigan, 14 F.3d 1444, 1453 (10th Cir.1994).
II. NEPA
The environmental groups make two arguments to challenge the district court’s disposition of the NEPA claims:
1. The Corps’ environmental analysis is deficient because the agency failed to consider the risk of oil spills and the cumulative impacts of pipelines.
2. The Corps failed to conduct an environmental analysis when verifying that the pipeline was permissible under the nationwide permit.
We reject both arguments. The environmental groups waived their claims involving failure to address oil spills and cumulative impacts, and the Corps was not required to conduct an environmental analysis when verifying compliance with the nationwide permit.
A. Requirements of NEPA
NEPA requires an agency to take a “hard look” at the environmental impacts of proposed actions. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). In taking this “hard look,” the agency must take appropriate steps: If the venture involves a “major Federal action” that would “significantly affeet[] the quality of the human environment,” the agency must prepare a detailed environmental impact statement. 42 U.S.C. § 4332(2)(C) (2012). *1048 But if the future effects are unclear, the agency can prepare an environmental assessment instead of a more detailed environmental impact statement. Dep’t of Transp. v. Pub. Citizen, 541 U.S. 752, 757, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004). If the environmental assessment shows that the impact would be insignificant, the agency need not provide any further énvi-ronmental report.[5] Id. at 757-58, 124 S.Ct. 2204.
B. Issuance of Nationwide Permit 12
The Corps prepared an environmental assessment of activities permitted under Nationwide Permit 12, which is challenged by the environmental groups. They contend the Corps unlawfully failed to consider
• the risk of oil spills associated with pipelines and
• the cumulative impacts of pipelines.
We conclude that these challenges are waived.
1. Waiver: The General Rule and the Pertinent Exceptions
Parties challenging an agency’s compliance with NEPA must ordinarily raise relevant objections during the public comment period. Dep’t of Transp. v. Pub. Citizen, 541 U.S. 752, 764-65, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004). But two exceptions exist. First, commenters need not point out an environmental assessment’s flaw if it is “obvious.” Id. at 765, 124 S.Ct. 2204. Second, a commenter does not waive an issue. if it is otherwise brought to the agency’s attention. Forest Guardians v. U.S. Forest Serv., 495 F.3d 1162, 1170 (10th Cir.2007).
2. Risk of Oil Spills
The environmental groups concede that no commenter raised the oil-spill issue. See Appellants’ Reply Brief at 11. Nonetheless, the environmental groups contend that the issue is not waived because
• the risk of oil spills is obvious, and
• the Corps knew about the risk of oil spills when issuing the nationwide permit.
We reject both of these contentions.[6] The environmental groups have not shown an obvious deficiency in the Corps’ environmental assessment, and the Corps’ knowledge of oil-spill risks does not relate to a deficiency in the Corps’ assessment for the construction, maintenance, and repair of utility lines.
a. Obviousness
The environmental groups assert that the oil-spill issue is not waived because the risk of oil spills is obvious. We reject this contention.
To qualify for this exception, the environmental groups must show that the *1049 omission of any discussion of oil-spill risks entailed an obvious flaw in the environmental assessment. The environmental groups argue that the risk of oil spills is obvious. But that is not the groups’ burden. The environmental groups must show thát the assessment for the construction, maintenance and repair of utility lines contained an obvious flaw, not that the agency failed to discuss impacts of an obvious risk associated with certain activity. See Dep’t of Transp. v. Pub. Citizen, 541 U.S. 752, 765, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004) (stating that “an [environmental assessment’s] ... flaws might be so obvious that there is no need for a commenter to point them out”). The fact that pipelines create a risk of spillage does not mean that the alleged deficiency in the Corps’ environmental assessment for the construction, maintenance, and repair of utility lines would have been obvious.
Nationwide Permit 12 authorized the discharge of dredged or fill.material in the construction, maintenance, and repair of a wide variety of utility lines, including lines to transmit gas, cable, electricity, telephone calls, radio transmissions, sewage, and oil. Appellants’ App. at 488-89; Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184, at 10,271-72 (Feb. 21, 2012), In light of the variety of utility lines involved, the Corps focused on the actions that it authorized (discharge of dredged and fill material in the construction, maintenance, and repair of utility lines) rather than the eventual operation of the utility lines. See Appellants’ App. at 528 (assessing the environmental consequences of the activities authorized by Nationwide Permit 12). Once the utility lines were completed, each utility would seek approval from the pertinent regulatory body with jurisdiction over operations. For example, TransCa-nada would need to seek and obtain authorization from the Pipeline and Hazardous Materials Safety Administration, which had jurisdiction over the operation of oil pipelines. See 49 C.F.R. §§ 195.401-402 (2012) (stating the requirements for operation of pipelines). Upon construction of the pipeline, TransCanada could not transport oil until it complied with the Pipeline and Hazardous Materials Safety Administration’s requirements addressing the risk of oil spills, 49 C.F.R. § 194.7 (2012).
The environmental groups argue that the Corps’ environmental assessment should have been broader, examining the risks from the utility lines’ operations as well as their, construction. But this criticism relates to the merits of the NEPA claim rather than the obviousness of the alleged deficiency to the Corps.[7] The Corps set out to consider all categories of environmental risks from the activities authorized under Nationwide Permit 12 (as well as the cumulative impacts of other activities affecting the nation’s aquatic resources). Appellants” App. at 528, 530. In considering these categories of environmental risks, the Corps distinguished between the activities that it authorized under the nationwide permit (construction, maintenance, and repair of utility lines) and the utility lines’ future operations. If that view was too restrictive, the deficiency would not have been obvious to the Corps, for TransCanada could not begin operations until it submitted a suitable plan to the Pipeline and Hazardous Materials Safety Administration to address the risk of oil spills. 49 C.F.R. § 194.7 (2012).
*1050 The environmental groups argue that the risk of oil spills would have been obvious to the Corps because of comments submitted to agencies concerning the proposed Keystone XL project. But these comments would have led the Corps to believe that the risk of oil spills fell within the domain of other agencies, for all of the comments about oil spills had been directed to the Pipeline and Hazardous Materials Safety Administration (rather than the Corps). See Appellants’ App. at 1180-92. In these comments, no one questioned the Corps’ focus on environmental risks from the activities authorized under the nationwide permits (rather than the environmental risks from future operations).
Because the Corps ordinarily confined its environmental assessments to impacts from the activities authorized under the nationwide permit (construction, maintenance, and repair of utility lines), rather than the eventual operation of these utility lines, the risk of oil spills would not have alerted the Corps to an obvious deficiency in its environmental assessment.
b. Independent Knowledge of the Risk/Otherwise Brought to the Corps’ Attention
The environmental groups also assert the oil-spill issue is not waived because the Corps knew about spill risks when issuing the nationwide permit. We reject this argument. Even if the Corps knew about spill risks, this knowledge would not have prevented a waiver.
We have recognized an exception to waiver when an issue is brought to the agency’s attention. See p. 1048, above. The Ninth Circuit Court of Appeals has equated this exception and the obviousness exception. See Barnes v. U.S. Dep’t of Transp., 655 F.3d 1124, 1132 (9th Cir.2011) (“This court has interpreted the ‘so obvious’ standard as requiring that the agency have independent knowledge of the issues that concern petitioners.”). We need not decide whether to adopt the Ninth Circuit’s view, as we have elsewhere concluded that the risk of oil spills would not have created an obvious deficiency in the Corps’ environmental analysis of the construction, maintenance, and repair of utility lines.
Even if we were to adopt the Ninth Circuit’s approach, its application here would make little sense. The Corps’ “independent knowledge” would be based on its role as a cooperating agency in the State Department’s environmental impact statement for the Keystone XL Pipeline. This environmental impact statement contained ample discussion of environmental risks involving oil spills. But the environmental impact statement addressed these risks as the domain of a separate agency: the Pipeline and Hazardous Materials Safety Administration. See Appellants’ App. at 1990 (“[Pipeline and Hazardous Materials Safety Administration] is responsible for regulations that require safe operations of hazardous liquid pipelines to protect human health and the environment from unplanned pipeline incidents.”). None of the commenters suggested that the Corps had any responsibility to address the risk of oil spills.
We may assume, for the sake of argument, that the Corps knew that issuance of the nationwide permit could lead to installation of oil pipelines, which in turn could create environmental risks from oil spills. How would that knowledge have mattered to the Corps? It considered that risk to fall within another agency’s responsibility. Regardless of whether that view was correct, it went unchallenged in the public comments for the issuance of Nationwide Permit 12 and the State Department’s consideration of the Keystone XL Pipeline. Thus, there would have been little reason *1051 for the Corps to consider oil spills in its environmental assessment.
In these circumstances, the Corps’ alleged knowledge about oil spills would not have avoided a waiver.
3. Cumulative Impacts
The environmental groups also argue the Corps violated NEPA by failing to consider the cumulative impacts of oil pipelines. This argument is also waived, as no commenter objected to the Corps’ assessment on this ground.
As discussed, parties challenging an agency’s compliance with NEPA must raise relevant objections during the comment period. See p. 1048, above. These objections must specifically raise the issue presented on appeal; if the objections do not raise the issue, it is waived. See Ariz. Pub. Serv. Co. v. E.P.A., 562 F.3d 1116, 1127 (10th Cir.2009) (stating that the appellant could not “rely on general or vague commentary ... to avoid the established principles of waiver” (citing Appalachian Power Co. v. E.P.A., 251 F.3d 1026, 1036 (D.C.Cir.2001))).
Some commenters mentioned cumulative impacts in other contexts, such as aquatic areas. But no one discussed a need for the Corps to consider the cumulative impacts on dry-land areas.
For example, some commenters objected to the use of multiple permits for multiple water crossings associated with one linear project. See Appellants’ App. at 480-81. In the view of these commenters, the use of multiple permits might “prevent the Corps from assessing the [overall] cumulative effects” of one linear project. Id. at 481. Another commenter requested that the Corps apply the half-acre limit to entire linear projects (rather than each water crossing) to ensure the Corps assessed “cumulative effects” of the entire project. Id. at 413.
Though these comments used variations of the phrase “cumulative impact,” the commenters were focusing on the cumulative impact on aquatic areas — not dry-land areas. As a result, this objection was waived. See Ariz. Pub. Serv. Co. v. E.P.A., 562 F.3d 1116, 1127 (10th Cir.2009) (holding that a party could not challenge the rationality of an agency rule because no party had specifically attacked the rule’s rationality during the comment period).[8]
4. Summary
Accordingly, we conclude that the environmental groups have waived their claims that the Corps violated NEPA by failing to consider oil-spill risks and cumulative impacts of pipelines.
C. Verification Under the Nationwide Permit
The environmental groups also argue the Corps should have prepared a NEPA analysis for the entire Gulf Coast Pipeline before issuing the verification letters. We disagree. The verifications do not constitute “major Federal action” warranting NEPA review, and the agency was not required to assess impacts of the entire pipeline.
*1052 1. Major Federal Action
NEPA requires agencies to evaluate the impacts of all “major Federal actions.” 42 U.S.C. § 4332(2)(C) (2012); Ross v. Fed. Highway Admin., 162 F.3d 1046, 1051 (10th Cir.1998). For the sake of argument, we can assume that the verifications constitute “federal actions.” But issuance of a verification letter would create a “major Federal action” only if it resulted in significant impact,[9] and the verification letters would not result in significant impact.
The environmental groups contend that the verifications constitute “major Federal action” because they were essential for the pipeline’s completion. The premise of the contention is neither self-evident nor supported by authority.
Without the ability to rely on Nationwide Permit 12 to discharge dredged and fill material, TransCanada might have been able to obtain an individual or regional permit[10] or routed the pipeline to avoid many of the waterway crossings. Thus, TransCanada might have been able to complete the pipeline without the verifications.
The environmental groups rely on two district court cases: Wyo. Outdoor Council v. U.S. Army Corps of Eng’rs, 351 F.Supp.2d 1232, 1242 (Dist.Wyo.2005), and Spiller v. Walker, No. A-98-CA-255-SS, 1998 U.S. Dist. LEXIS 18341, at *39-41 (W.D.Tex. Aug. 25, 1998). Reliance on these cases is misplaced.
In Wyo. Outdoor Council, the court stated that the Corps is the “gatekeeper for approval” of projects and, as the gatekeeper, it should consider environmental impacts of those projects. Wyo. Outdoor Council, 351 F.Supp.2d at 1242. But the court was describing the Corps’ duty when it issues a regional permit,[11] not when it issues verifications.
In Spiller, the court stated in dicta that the Corps would commit “major Federal action” by granting an easement and dredge-and-fill permit for a proposed pipeline. Spiller, 1998 U.S. Dist. LEXIS 18341, at *43-44. But as the statement indicates, the Corps had not yet issued a permit. Thus, the district court’s statement had no effect on .the outcome.
These decisions do not persuade us to expand the Corps’ NEPA obligations, for the Corps neither acted as a “gatekeeper” nor approved the pipeline; the Corps simply verified that TransCanada’s project was covered by Nationwide Permit 12.
At that point, there was little reason for a new NEPA review because the Corps had already conducted a NEPA analysis when issuing Nationwide Permit 12. As long as the proposed activities were authorized by the nationwide permit, the Corps would have had little reason to conduct a second NEPA review when issuing the verification letters.
A similar issue arose in Snoqualmie Valley Pres. Alliance v. U.S. Army Corps of Eng’rs, 683 F.3d 1155 (9th Cir.2012) (per curiam). There a utility planned to lower a dam to mitigate flooding problems. Snoqualmie Valley, 683 F.3d at 1157. Before carrying out this plan, the utility asked the Corps to verify that lowering of the dam would be covered by two existing *1053 nationwide permits. Id. at 1158. Downstream property owners objected, arguing that the Corps violated NEPA by allowing the utility to proceed under the nationwide permits. Id. at 1164. The Ninth Circuit Court of Appeals rejected the argument, explaining that the Corps must comply with NEPA when promulgating the nationwide permits — not when someone seeks to act under the permit. Id. at 1164.
The court’s explanation is persuasive and equally applicable here. The Corps complied with NEPA when it issued Nationwide Permit 12 for the construction, maintenance, and repair of a wide variety of utility lines. Though the Corps did not issue an environmental impact statement, it did issue an environmental assessment and ultimately concluded that the environmental impact would be insignificant. When the Corps verified that TransCana-da could proceed under the nationwide permit, the Corps was simply saying that the permit applied; the Corps was not authorizing anything that it had not already authorized when issuing the permit. See Riverside Irrigation Dist. v. Andrews, 758 F.2d 508, 511 (10th Cir.1985) (stating that nationwide permits are “automatic in that if one qualifies, no application is needed before beginning the discharge activity”).
The environmental groups argue that Snoqualmie is distinguishable in two ways:
1. There the court addressed a single location, and here the pipeline went through thousands of water crossings.
2. There another agency (FERC) conducted a NEPA analysis of the project (lowering of the dam), but here no one ever assessed the impact of the project (operation of an oil pipeline).
Appellants’ Opening Br. at 39-40; Appellants’ Reply Br. at 16-17. These distinctions are invalid because they overlook similarities between the two cases and create distinctions that had nothing to do with the Snoqualmie court’s rationale.
The environmental groups erroneously assume that the environmental assessment of the project was valid in Snoqualmie and was invalid here. In both cases, another agency issued an environmental impact statement for an earlier version of the project. In Snoqualmie, the other agency (FERC) evaluated the environmental impact of an earlier versión of the project (lowering of the dam). Snoqualmie Valley, 683 F.3d at 1158.[12] In our case, another agency also issued an environmental impact statement for an earlier version of the project: construction of an oil pipeline that would have run further northward into Canada. In trying to distinguish the two cases, the environmental groups apparently assume that FERC’s environmental impact statement of the earlier project would have obviated the need for a new NEPA review and that the State Department’s environmental impact statement of the oil pipeline wouldn’t. But why? In both cases, the environmental impact statement addressed an earlier version of the project rather than the one ultimately subject to the Corps’ verifications.
Perhaps for that reason, the court in Snoqualmie. did not rely in any way on FERC’s issuance of an environmental impact statement for the earlier project. The court merely mentioned the environmental impact statement in one sentence of the background facts. Id. The court explained that there was no need for a new NEPA analysis at the verification stage because of the limited purpose of a verifi *1054 cation letter: At that point, the Corps’ only function is to verify that the project is covered by the nationwide permit. Id. at 1164. In light of that limited purpose for verification, the court concluded: “Verifying that permittees may properly proceed under a nationwide permit does not require a full NEPA analysis at the time of verification.” Id.
That is also true here. In issuing the verifications, the Corps simply confirmed that TransCanada’s activities would fall within the terms of Nationwide Permit 12. There would have been little reason for the Corps to conduct a new NEPA analysis at that point. Another NEPA analysis was unnecessary in Snoqualmie and was unnecessary here.
2. Scope of Analysis
The environmental groups also argue the Corps should have evaluated the impacts of the entire pipeline project because the agency had “control and responsibility” over that project. In support, the environmental groups rely on the Corps’ NEPA implementation regulations, codified at 33 C.F.R. § 325, Appendix B.
We disagree for two reasons:
1. Appendix B does not apply to the verification process.
2. Even if Appendix B applied, the environmental groups have not shown that the Corps would have had sufficient “control and responsibility” over the pipeline project.
Appendix B does not apply to the verification process. In adopting Appendix B, the Corps indicated that Appendix B would not apply to nationwide permits (or verifications of permit coverage) when it issued the appendix. See Environmental Quality; Procedures for Implementing the National Environmental Policy Act (NEPA), 53 Fed.Reg. 3120-01, 3126 (Feb. 3, 1988).[13] We defer to the Corps’ interpretation unless it is plainly erroneous or inconsistent with Appendix B. Kentuckians for the Commonwealth v. U.S. Army Corps of Eng’rs, 746 F.3d 698, 708 n. 3 (6th Cir.2014).
We do not regard the Corps’ interpretation as plainly erroneous or inconsistent with the appendix. The appendix was apparently designed to guide Corps officials in evaluating permit applications for individual projects,[14] not to evaluate whether a project qualified under an existing nationwide or regional permit.
3. The Corps’ Supposed Mistake
The environmental groups arg-ue that the Corps issued the nationwide permit *1055 under the mistaken belief that another agency would prepare an environmental impact statement. Appellants’ Opening Br. at 40.
This argument is based on a selective quotation from the Corps’ decision document addressing issuance of the nationwide permit. There the Corps noted that one commenter had asked if someone would need an individual permit for an activity covered by Nationwide Permit 12 “when a Corps district participates as a cooperating agency for an environmental impact statement.” Appellants’ App. at 517. Under federal regulations, an agency can serve as a “cooperating agency” only if another agency serves as the “lead agency.” 40 C.F.R. §§ 1501.6, 1508.5 (2012). Thus, the question assumed that another agency would serve as the lead agency and retain responsibility for issuing an environmental impact statement.
The Corps answered the commenter’s question, noting that the lead agency would address non-aquatic environmental impacts when the Corps served as a cooperating agency. Appellants’ App. at 517. The Corps did not suggest that other agencies would address non-aquatic impacts whenever someone undertook an activity authorized by the nationwide permit.
4. Summary
In issuing the verification letters, the Corps did not violate NEPA. The verifications were not “major Federal actions” that would require NEPA review, and the Corps had no obligation to assess the environmental impacts of the entire Gulf Coast Pipeline.
III. Clean Water Act
Section 404(e) of the Clean Water Act authorizes the Corps to issue nationwide permits when dredge-and-fill activities would result in minimal adverse environmental effects. 38 U.S.C. § 1344(e)(1) (2012). According to the environmental groups, Nationwide Permit 12 violates § 404(e) by
• authorizing linear projects with substantial environmental impacts and
• deferring part of the minimal-impacts determination to project-level personnel.
We reject both arguments. The environmental groups have not shown that the permit authorizes linear projects with more-than-minimal impacts, and the Corps has permissibly interpreted the statute to allow partial deferral of its minimal-impacts analysis.
A. Utilization of the Permit
The environmental groups argue that the nationwide permit allows activities with more-than-minimal impacts. We disagree.
The Corps has concluded that the environmental impacts would be minimal. See Appellants’ App. at 530, 535, 544, 553. This conclusion involved the agency’s technical expertise. See Utah Envtl. Congress v. Richmond, 483 F.3d 1127, 1140 (10th Cir.2007).
The environmental groups question that conclusion. Because this conclusion is based on technical expertise, the environmental groups face a heavy burden. Balt. Gas & Electric Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). They must show that the Corps’ minimal-impact determination lacked any “substantial basis in fact.” Fed. Power Comm’n v. Fla. Power & Light Co., 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972). The environmental groups have not met this burden.
*1056 They assert that TransCanada can use the permit limitless times for a single linear project. The Corps disagreed, concluding that it could assure minimal impact by applying the existing standard (loss 00 acre of U.S. waters) to each water crossing as long as it was “separate and distant.” Appellants’ App. at 508, 513-14.
In arriving at this conclusion, the Corps explained that it had a long-standing practice of calculating the%-acre threshold “separately for each separate and distant crossing.” Id. at 513; see Regulatory Guidance Letter 88-06, at 1, 3 (June 27, 1988), http://www.usace.army.mi1/Portals/2/ docs/civilworks/RGLS/rgl88-06.pdf. Applying this standard, the Corps determined that the project would result in the loss of only 0.63 acres of wetlands. Appellants’ App. at 647, 2506. Thus, the Corps effectively found that the total loss in wetlands, over more than 2,000 water crossings, was only slightly larger than the loss permitted for each separate and distant crossing. And even for these losses, TransCanada had to buy credits from a wetlands mitigation bank. Id. at 647-48.
The environmental groups challenge the use of this test (whether the crossings are “separate and distant”). But the environmental groups have not shown that the Corps failed to adequately control aquatic impact by allowing multiple uses of the)é-acre test for “separate and distant” crossings. The Corps’ use of the “separate and distant” test was not arbitrary or capricious. See Greater Yellowstone Coal. v. Flowers, 359 F.3d 1257, 1269-73 (10th Cir.2004) (holding that the Corps’ granting of a § 404 permit was not arbitrary or capricious even though the project would eliminate 1.45 acres of wetlands).
B. Partial Deferral of Analysis
As discussed, a § 404 permit allows the Corps to authorize an activity only if the environmental impact would be minimal. See 33 U.S.C. § 1344(e) (2012). In deciding to issue Nationwide Permit 12, the Corps analyzed the environmental impacts of dredge-and-fill activity related to utility-line construction. Appellants’ App. at 528-35. But in conducting this analysis, the Corps noted that its analysis had to entail some level of speculation about future operations. Id. at 528. Thus, the Corps added safeguards involving the use of project-level personnel, requiring them to ensure that particular activities would not have more than a minimal impact on the aquatic environment. Id.
The environmental groups argue the Corps violated § 404(e) by partially deferring the minimal-impact determination. We disagree. The Corps permissibly interpreted § 404(e) to allow establishment of additional safeguards through the use of project-level personnel.
1. Standard of Review (Chevron )
The environmental groups have questioned the Corps’ interpretation of the Clean Water Act. We review this contention under the two-part test stated in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[15] Under Chevron, we first ask whether Congress has directly spoken on the issue. Chevron, 467 U.S. at 843-44, 104 S.Ct. 2778. If Congress has not directly spoken, we ask whether the Corps’ interpretation of the Clean Water Act is permissible. See id. If the Corps’ interpretation is *1057 permissible, we must defer to that interpretation. Id. at 844, 104 S.Ct. 2778.
2. Step One of Chevron: Ambiguity of § 404(e)
We first ask: Has Congress directly spoken on whether the Corps can assign project-level personnel the task of ensuring minimal impact on the environment? On this issue, Congress has not directly spoken.
Under § 404(e), the Corps must ensure that the authorized activities have only minimal environmental impact. See 33 U.S.C. § 1344(e) (2012). But § 404(e) does not specify how or when the Corps must make its minimal-impact determination. By omitting these aspects of the determination, Congress presumably authorized the Corps to fill in the gaps. See City of Arlington v. F.C.C., — U.S. —, 133 S.Ct. 1863, 1868, — L.Ed.2d — (2013) (“Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion.”); see also Catawba Cnty., N.C. v. E.P.A., 571 F.3d 20, 35 (D.C.Cir.2009) (explaining that ambiguity in the statutory text “suggest[s] a congressional intent to leave unanswered questions to an agency’s discretion and expertise”). Thus, § 404(e) does not clarify whether the Corps can defer part of its minimal-impact analysis.[16]
3. Step Two of Chevron: Permissibility of Interpretation
Because Congress has not directly spoken on this issue, we ask: Has the Corps permissibly interpreted § 404(e) to allow partial deferral of the minimal-impact determination? The Corps’ interpretation is permissible based on the text of § 404(e) and the difficulty of predicting the impact of activities allowed under nationwide permits.
a. Text of § 404(e)
We first consider the language in § 404(e). See United States v. Hubenka, 438 F.3d 1026, 1032-33 (10th Cir.2006) (analyzing an interpretation of the Clean Water Act to determine whether the Corps’ interpretation of Act was permissible). This language reflects an acknowledgment that the Corps might need to police the use of a permit to ensure that the environmental impact is minimal, for § 404(e)(2) recognizes the possibility that authorized activities could result in more-than-minimal impacts. For example, this section authorizes revocation or modification of a nationwide permit if the Corps “determines that the activities authorized by [the permit] have an adverse impact on the environment.” 33 U.S.C. § 1344(e)(2) (2012). The Corps could reasonably conclude that project-specific review by district engineers would facilitate the decision *1058 whether to revoke or modify a nationwide permit.
b. Difficulty of Fully Predicting the Impact
The Corps could have recognized the difficulty of predicting impacts from all future activities falling within Nationwide Permit 12. Thus, the Corps’ interpretation of § 404(e) supplies a reasonable way of safeguarding the environment from unforeseen impacts. In similar circumstances, the Fourth Circuit Court of Appeals upheld the use of project-level personnel in Ohio Valley Envtl. Coal. v. Bulen:
[I]t is impossible for the Corps’ ex ante determinations of minimal impact to be anything more than reasoned predictions. Even under the paradigmatic general permit envisioned by the district court, where the parameters of the authorized activities are delineated in objective, measurable terms, the Corps’ minimal-impact determinations would necessarily be a forecast, only. This is so because the environmental impact of the activities authorized by a general permit depends on factors that, as a practical matter, are outside the Corps’ ability to predict with certainty ex ante. This uncertainty is especially acute when the Corps issues a nationwide permit like [Nationwide Permit] 21 because the Corps must attempt to forecast the environmental effects the authorized activities could have if undertaken anywhere in the country under any set of circumstances.
429 F.3d 493, 501 (4th Cir.2005).
Though we are not bound by Bulen, we regard it as persuasive. Nationwide Permit 12, like all nationwide permits, governs a broad range of activities that can be undertaken anywhere in the country under a wide variety of circumstances. For example, Nationwide Permit 12 addresses the construction, maintenance, repair, and removal of all utility lines throughout the nation. .Appellants’ App. at 508. In considering how to address this range of activities, the Corps noted that utility lines are used in a variety of ways, carrying resources (like water, fuel, and electricity), facilitating communication (like telephone lines, internet connections, and cable television), and removing waste. Id. at 527. The Corps ultimately adopted a set of conditions reflecting the foreseeable effects of activities authorized by the nationwide permit. Id. at 528. But the Corps recognized that this assessment was inherently speculative:
The issuance of [a nationwide permit] is based on a general assessment of the effects on public interest and environmental factors that are likely to occur as a result of using this [nationwide permit] to authorize activities in waters of the United States. As such, this assessment must be speculative or predictive in general terms. Since [nationwide permits] authorize activities across the nation, projects eligible for [nationwide permit] authorization may be constructed in a wide variety of environmental settings. Therefore, it is difficult to predict all of the indirect impacts that' may be associated with each activity authorized by [a nationwide permit].

Id.

The environmental groups argue that Bulen is distinguishable because there (1) another agency (the Department of Interi- or) would evaluate the activity to be regulated (operation of coal mines), and (2) the Corps undertook a comprehensive analysis of the impacts from the authorized activities. These distinctions are misguided.
The first distinction is based on a single sentence in Bulen. In this sentence, the Fourth Circuit Court of Appeals summarized the nationwide permit, pointing out that it had authorized discharges of *1059 dredged or fill material associated with surface coal mining and reclamation operations “so long as those operations [we]re authorized by the Department of Interior” or satisfied the requirements for programs under the Surface Mining Control and Reclamation Act of 1977. Bulen, 429 F.3d at 498. The court did not refer again to the Department of Interior’s regulation or give any indication that these regulations affected the holding or rationale. See id. passim.[17]
The Fourth Circuit Court of Appeals also noted that the Corps had assessed the environmental impacts from a broad range of activities. Id. at 499. But the court noted that the Corps’ assessment was inherently speculative because of the variety of ways that coal miners might invoke Nationwide Permit 21. Id. at 501.
The same is true of Nationwide Permit 12. When considering whether to issue this permit, the Corps analyzed the environmental impacts of activities involving utility lines. But the Corps pointed out that its task was complicated by the variety of ways that companies might undertake to construct, maintain, repair, and remove utility lines. Appellants’ App. at 527-28.
The environmental groups complain that in doing so, the Corps failed to evaluate the environmental impacts from oil pipeline projects like this one. How could the Corps have done that? After all, the Corps had issued Nationwide Permit 12 before TransCanada proposed this pipeline. See Appellants’ Reply Br. at 13 (arguing, in a different context, that TransCa-nada decided to divide the Keystone XL Pipeline into two parts only after the comment period had closed for Nationwide Permit 12). In fact, the environmental groups argue “that [Nationwide Permit 12] was not meant for these major oil pipelines.” Id. If no one contemplated that Nationwide Permit 12 would cover major oil pipelines, why would the Corps have considered the environmental impacts from a major oil pipeline? And if the Corps did consider these impacts, how would it have assessed the environmental impact from this particular pipeline?
The problem, as the Bulen court explained, is that nationwide permits are inherently broad and could cover a variety of activities. Ohio Valley Envtl. Coal. v. Bulen, 429 F.3d 493, 501 (4th Cir.2005). The agency might predict some of these activities, but not others. Thus, the Corps predicted how companies might use the nationwide permit and assessed the environmental impacts from those uses.. Appellants’ App. at 528. In Bulen, however, the court recognized that this assessment had to entail some. level of speculation. Bulen, 429 F.3d at 501.
The same is true here. The Corps made an environmental assessment of the predictable uses of Permit 12, but recognized the futility of predicting every conceivable use for every conceivable type of utility line anywhere in the United States. The Corps need not conduct a new NEPA analysis every time someone conceives a new use for a national permit.
c. Arguments Against the Corps’ Interpretation
The environmental groups argue that partial deferral is not permissible under § 404(e) for two reasons:
*1060 1. The Corps must finalize minimal-impact determinations before issuing nationwide permits because the permits are final agency actions.
2. Partial deferral would restrict the public’s ability to meaningfully comment on proposed permits.
We reject both arguments. Finality is not relevant here, and partial deferral would not restrict the public’s ability to comment.
First, finality of the nationwide permit does not bear on whether the Corps could enhance its environmental protection by assigning additional oversight responsibilities to project-level personnel. Finality bears only on whether the permit is reviewable under the Administrative Procedure Act, and no one has questioned jurisdiction. See McKeen v. U.S. Forest Serv., 615 F.3d 1244, 1253 (10th Cir.2010) (“Pursuant to the APA, we have jurisdiction to review only ‘final agency actions.’ ”).
Second, partial deferral would not restrict the public’s ability to comment on proposed permits. See 33 C.F.R. 325.3 (2012) (stating that the Corps must provide the public with “sufficient information to give a clear understanding of the nature and magnitude of [proposed] activities] to generate meaningful comment”). For every proposed permit, the Corps must prepare a written evaluation of all potential impacts of authorized activities. 33 C.F.R. § 230.7 (2012). The Corps has deferred only those aspects of the evaluation that cannot practically be undertaken before a project is underway. Thus, the impact on opportunities for public comment would not preclude the Corps from interpreting § 404(e) in a way that would allow oversight by project-level personnel.
d. Summary
For these reasons, we conclude that the Corps has permissibly interpreted § 404(e) to allow use of project-level personnel to evaluate environmental impacts. The Corps’ interpretation is consistent with the text and practicalities of § 404(e).
IV. Nationwide Permit 12
Finally, the environmental groups argue that the Corps violated the terms of its own permit by failing to document analysis of cumulative impacts in the verification letters or administrative record.
We disagree. Though district engineers must analyze cumulative impacts, the engineers need not include a written analysis of cumulative impacts within the verification letters. Though this analysis is absent in the letters, it appears in the record. Thus, we conclude that the Corps’ issuance of the verification letters was not arbitrary or capricious.[18]
A. Verification Letters
The environmental groups argue that the agency issued the letters in violation of the nationwide permit by not including a cumulative-impacts analysis. We disagree.
The Corps has directed district engineers to analyze the cumulative impacts of proposed projects when reviewing pre-con-struction notifications. See Reissuance of Nationwide Permits, 77 Fed.Reg. 10,184, 10,186 (Feb. 21, 2012). But, the Corps has not required district engineers to include a *1061 written cumulative-impacts analysis in the verification letters. Thus, district engineers could have verified compliance without stating how they had analyzed the cumulative impacts. See Snoqualmie Valley Pres. Alliance v. U.S. Army Corps of Eng’rs, 683 F.3d 1155, 1163 (9th Cir.2012) (per curiam) (concluding that verification letters need not go beyond the base findings if the verification letters are supported by the record).
B. Record of the Analysis
The environmental groups also argue that the record does not show cumulative-impact analyses by the district engineers. We disagree, for the record shows that district engineers analyzed the cumulative impacts of the proposed crossings.
We will uphold the verifications as long as we can discern that the agency adequately considered cumulative impacts. See Licon v. Ledezma, 638 F.3d 1303, 1308 (10th Cir.2011) (‘We will ‘uphold a decision of less than ideal clarity if the agency’s path may be reasonably discerned.’ ” (quoting Nat’l Ass’n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007))).
We can reasonably discern that district engineers considered cumulative impacts of the proposed crossings. For instance, the record shows three facts:
1.District engineers prepared verification memoranda[19] that describe the Corps’ analysis of pipeline impacts, impose special conditions to ensure minimal impacts, and conclude that the pipeline (with proposed mitigation) would “result in no more than minimal individual and cumulative adverse environmental effects....”[20]
2. The verification letters state that district engineers analyzed “[a]ll proposed crossings” of the pipeline “relative to the definition of single and complete project for linear projects.” [21]
3. Corps officials from separate districts communicated about the pipeline’s verification to ensure that officials had necessary information and had fully considered the pipeline’s collective impact.[22]
Based on the combination of these three facts, we can reasonably discern that the agency analyzed the cumulative impacts of the proposed crossings. Accordingly, the Corps’ issuance of the verification letters was not arbitrary or capricious.
V. Conclusion
In conclusion, we affirm the entry of judgment for the defendants. In Nationwide Permit 12, the Corps did not violate NEPA or the Clean Water Act, and the agency did not issue the verification letters in violation of NEPA or the nationwide permit.

. The Corps has defined the term "single and complete project” to mean "the total project proposed or accomplished by one owner/de-vfeloper or partnership or other association of owners/developers.” 33 C.F.R. § 330.2(i) (2012). For linear projects like utility lines, the Corps considers each crossing of a waterway to be a "single and complete project” as long as these crossings are "separate and distant." Id.

. The Gulf Coast Pipeline is the southern segment of a larger pipeline project called the "Keystone XL Pipeline.”

. The intervenors have raised prudential mootness. Prudential mootness concerns a court’s discretion, not its power, to grant relief. S. Utah Wilderness Alliance v. Smith, 110 F.3d 724, 727 (10th Cir.1997). We elect not to address prudential mootness, as we conclude the claims fail on other grounds. See Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng’rs, 702 F.3d 1156, 1167 (10th Cir.2012) (“As for prudential mootness, it is within the court’s discretion to decline to address an issue on prudential mootness grounds.”).

. Instead, the agency is to make a "finding of no significant impact.” Pub. Citizen, 541 U.S. at 757-58, 124 S.Ct. 2204.

. The environmental groups also state that until this project, installation of all major oil pipelines had undergone a project-level NEPA review. Based on this statement, the environmental groups say that they (1) did not perceive a need to make comments when the Corps considered the nationwide permit, and (2) should not be penalized for raising the issue in connection with the Keystone XL Pipeline proceedings rather than as an objection to Nationwide Permit 12. For the sake of argument, we can assume the environmental groups are correct. They appear to imply that they should not be subjected to the ordinary rules of exhaustion, requiring comment to the Corps as it was considering whether to issue the nationwide permit. But the environmental groups have not provided authority or analysis that would justify an exception to the ordinary rules of exhaustion based on the alleged change in practice.

. The environmental groups argue that some other courts require the Corps to consider the risk of oil spills. See Ocean Advocates v. U.S. Army Corps of Eng’rs, 402 F.3d 846, 868 (9th Cir.2005); Sierra Club v. Sigler, 695 F.2d 957, 962 (5th Cir.1983). This argument relates to the merits rather than exhaustion. Because the oil-spill claim is unexhausted, we do not reach the merits.

. In her thoughtful concurrence, Judge McHugh concludes that it would have been obvious to the Corps that its analysis of cumulative effects was too restrictive. In our view, however, the environmental groups did not invoke the obviousness exception on the NEPA claims involving cumulative effects. See Appellants’ Opening Br. at 33-34; Appellants’ Reply Br. at 14-16. Instead,'we believe the obviousness exception was raised solely on the NEPA claims involving oil spills., See Appellants’ Opening Br. at 25-26; Appellants’ Reply Br. at 11, 14.

. See 40 C.F.R. § 1508.18 (2012).

. See 33 C.F.R. § 330.1(d) (2012) (stating that Corps officials may instruct permittees whose projects do not qualify for nationwide permits to "apply for a regional general permit or an individual permit”).

.Regional permits are authorized under the same section of the Clean Water Act as nationwide permits. See 33 U.S.C. § 1344(e) (2012). But regional permits authorize activities in specific regions instead of the entire country. 33 C.F.R. § 330.2(b) (2012).

. In Snoqualmie, the Corps also conducted a separate environmental assessment of an earlier version of the project. Snoqualmie Valley, 683 F.3d at 1158.

. During the comment period for Appendix B, commenters suggested that the Corps categorically exclude verifications from NEPA documentation. See Environmental Quality; Procedures for Implementing the National Environmental Policy Act (NEPA), 53 Fed.Reg. 3120, 3126 (Feb. 3, 1988) ("Several suggested regional and nationwide general permits should be added to the list.”). The Corps responded that the exclusion was not necessary:
The regional and nationwide general permits are permits for certain types of activities for which there has already been a NEPA review and NEPA documents have already been prepared on a generic basis. Therefore, it is not necessary to add them to the list of actions categorically excluded from NEPA documentation.
Id. Thus, the agency chose not to categorically exclude verifications from the NEPA process. See 33 C.F.R. § 325, Appendix B(6) (2012).

. See, e.g., 33 C.F.R. § 325, Appendix B(7)(a) (2012) (explaining how a district engineer should evaluate an "applicant’s proposal” when preparing a NEPA document); id., Appendix B(7)(b) (explaining how district engineers should define the scope of a NEPA document when a "permit applicant” proposes to conduct "a specific activity requiring a Department of the Army ... permit”).

. Chevron deference is appropriate because the Corps administers § 404(e) of the Clean Water Act. 33 U.S.C. § 1344(e) (2012); City of Arlington v. F.C.C., — U.S. —, 133 S.Ct. 1863, 1868, — L.Ed.2d — (2013).

. The environmental groups argue that partial deferral violates the “unambiguously expressed intent of Congress” for two reasons:
1. Nationwide permits are final actions that "mark[ ] the completion of the decision-making process”; thus, the Corps must finalize the minimal-impact determination before issuing such permits.
2. Partial deferral would deny the public the opportunity to meaningfully comment on proposed nationwide permits.
Appellants' Opening Br. at 44-45. But these arguments do not address whether Congress has directly spoken on the issue, which is our only concern at step one of Chevron. See United States v. Hubenka, 438 F.3d 1026, 1031 (10th Cir.2006); see also Aragon-Salazar v. Holder, 769 F.3d 699, 706 (9th Cir.2014) ("Using extrinsic policy considerations to determine whether there is statutory ambiguity is plainly contrary to Supreme Court precedent on both Chevron step one and statutory interpretation more generally.”). Thus, we reject these arguments as to step one and will instead address them at step two. See pp. 1059-60, below.

. If the Corps had relied on additional regulations by the Department of Interior, the same would have been true here. The Federal Energy Regulatory Commission oversees regulatory regimes for oil pipelines and the Department of Transportation's Pipeline and Hazardous Materials Safety Administration regulates pipeline safety. James J. Monast, Brooks R. Pearson & Lincoln F. Pratson, A Cooperative Federalism Framework for LCS Regulation, 7 Envtl. & Energy L. & Pol'Y J. 1, 23-24 (2012).

. The environmental groups also state in their heading that the verification letters violated the Clean Water Act. See Appellants’ Opening Br. at 48. But the environmental groups have not developed this argument beyond the heading. Because this argument has not been developed, it is waived. See Garrett v. Selby Connor Maddux & Janer, 425 F.3d 836, 841 (10th Cir.2005) (“Issues will be deemed waived if they are not adequately briefed.” (citing Utahns for Better Transp. v. U.S. Dep’t of Transp., 305 F.3d 1152, 1175 (10th Cir.2002))).

.The environmental groups suggest that the memoranda are deficient because they rely on an outdated standard ("Condition 27(e)") after it had been replaced. But the district court held that the environmental groups had waived this argument by failing to raise it until the reply brief on summaiy judgment. We conclude that the district court acted within its discretion in applying the local rule. See Bylin v. Billings, 568 F.3d 1224, 1230 n. 7 (10th Cir.2009) (stating that we owe considerable deference to a district court’s interpretation and application of its own local rules). Thus, we will not address this argument orí appeal.

. Appellants’ App. at 1728, 1741, 1770.

. E.g., Appellants’ App. at 1760 ("Scope of Analysis”).

. Appellants’ App. at 2190-2210.