# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 9, 2015          Decided September 29, 2015

No. 14-5205

SIERRA CLUB,
APPELLANT

v.

UNITED STATES ARMY CORPS OF ENGINEERS, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-01239)

———

*Douglas P. Hayes* argued the cause for appellant. With him on the briefs were *Eric E. Huber* and *Joshua Stebbins*.

*Michael T. Gray*, Attorney, U.S. Department of Justice, argued the cause for Federal appellees. With him on the brief were *John C. Cruden*, Assistant Attorney General, and *Ty Bair* and *David C. Shilton*, Attorneys.

*David H. Coburn* and *Cynthia Taub* were on the brief for appellee Enbridge Pipelines (FSP), L.L.C. *Joshua H. Runyan* entered an appearance.

Before: BROWN, PILLARD and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Opinion concurring in the judgment filed by *Circuit Judge* BROWN.

PILLARD, *Circuit Judge*:  The central question in this appeal is the scope of environmental review the National Environmental Policy Act (NEPA) required before a particular oil pipeline was built. Oil pipelines help to satisfy national and global energy demand by pumping tens of millions of barrels of oil across the United States each month. They have also sparked intense debates about energy and environmental policies.  The proposed Keystone XL Pipeline alone has generated millions of comments to the government on a spectrum of issues.  The construction and operation of pipelines necessarily affect land, water, air, plants, animals, and human life, and carry the potential for unintended damage.  More than a dozen pipeline accidents occur on average each month in the United States—most minor, some grave.  If not transported via pipelines, oil might remain in the ground and never be used, or might be brought to market in other ways—potentially by methods less efficient and more harmful than pipeline transportation.

The U.S. Secretary of State must approve oil pipelines that cross international borders, *see* Exec. Order 11,423, 33 Fed. Reg. 11,741 (Aug. 16, 1968), but that requirement is inapplicable to wholly domestic pipelines.  Separately, the Pipeline and Hazardous Materials Safety Administration (PHMSA) within the U.S. Department of Transportation must approve oil spill response plans under the Oil Pollution Control Act of 1990 for pipelines that might spill oil into navigable waters or the shoreline, *see* 33 U.S.C. § 1321(j)(5)(A)(i), (C)(iv), (G); Executive Order 12,777, 56 Fed. Reg. 54,757, 54,760 (Oct. 18, 1991), 49 C.F.R. § 194.7,

but there is no claim here PHMSA must approve a response plan before a pipeline can be built and begin operating.[1]

Notwithstanding the absence of any general permitting requirement for domestic oil pipelines, federal ownership or control of lands and other assets, as well as resource-specific environmental statutes such as the Clean Water Act, often do call for federal approvals before an oil pipeline can be built. Where there is federal action, NEPA requires governmental review, with public input, of the full range of such action's reasonably foreseeable direct or indirect environmental effects. Federal actions subject to NEPA include federal authorizations granted to private parties, such as oil pipeline construction companies.

The Flanagan South oil pipeline pumps crude oil across 593 miles of American heartland from Illinois to Oklahoma. Almost all of the land over which it passes is privately owned. As soon as Enbridge Pipelines (FSP), LLC, (Enbridge) began building the pipeline in 2013, the Sierra Club, a national environmental nonprofit organization, sued the federal government seeking to set aside several federal agencies' regulatory approvals relating to the pipeline and to enjoin the pipeline's construction and operation in reliance on any such approvals.

Sierra Club's chief claim was that various federal easements and approvals that Enbridge obtained from the agencies gave necessary go-ahead to the Flanagan South project as a whole, and thus the entire pipeline was a foreseeable effect of federal action requiring public environmental scrutiny under NEPA. Sierra Club also

---

[1] The complaint asserted a PHMSA-related NEPA claim, but the district court dismissed that claim for lack of final agency action because no oil spill response plan had been finalized.

claimed that one of the agencies, the United States Army Corps of Engineers (the Corps), unlawfully authorized dredge and fill activities at the pipeline's nearly two thousand minor water crossings by verifying that they fell within the authority of a general permit, Nationwide Permit 12, that the Corps had promulgated under the Clean Water Act. Sierra Club argued that the Corps impermissibly conducted its analyses of the water crossings' cumulative impacts by region, rather than considering the pipeline as a whole, and that its conclusions that the crossings would have only minimal adverse environmental effects were inadequately supported and conclusory. After Sierra Club filed suit, Enbridge promptly intervened as a defendant. The district court denied preliminary injunctive relief and entered summary judgment in favor of the agencies and Enbridge.

On appeal, Sierra Club principally contends that the district court erred by failing to require the agencies to analyze and invite public comment on the environmental impact of the whole pipeline under NEPA, including the lengthy portions crossing private land and not otherwise subject to federal approvals. Sierra Club also presses its challenge to the Corps's Clean Water Act verifications of the pipeline's many water crossings. Sierra Club further contends that the district court reversibly erred by failing to allow the organization to supplement and amend its complaint. Sierra Club's proposed new complaint added claims that the Corps and the Bureau of Indian Affairs within the U.S. Department of the Interior (the Bureau) had, while the litigation was pending, completed separate NEPA analyses relating to each of the easements the agencies had granted for the pipeline to cross federally controlled land, and that those analyses were insufficient.

We hold that the federal government was not required to conduct NEPA analysis of the entirety of the Flanagan South pipeline, including portions not subject to federal control or permitting. The agencies' respective regulatory actions—in the form of easements, Clean Water Act verifications, and authorization to harm or kill members of endangered species without incurring liability under the Endangered Species Act (ESA)—were limited to discrete geographic segments of the pipeline comprising less than five percent of its overall length. As explained below, the agencies were required to conduct NEPA analysis of the foreseeable direct and indirect effects of those regulatory actions. However, on the facts of this case, the agencies were not obligated also to analyze the impact of the construction and operation of the entire pipeline. We also reject Sierra Club's Clean Water Act challenge to the Corps's verifications of Flanagan South's water crossings under Nationwide Permit 12 because the Corps was authorized to conduct its review on a regional rather than nationwide basis, and the Corps's District Managers adequately supported their verification decisions. Finally, we hold that the district court did not abuse its discretion in denying Sierra Club's motion to supplement and amend its complaint, because the proposed new allegations would not have affected the dispositive legal analysis.

## I.   Background

### A.   Flanagan South Planning

Enbridge began the planning and permitting process for the Flanagan South project in 2011. The 593-mile-long pipeline was designed to ship roughly 600,000 barrels of oil per day across Illinois, Missouri, Kansas, and Oklahoma. The new pipeline would expand Enbridge's capacity to ship crude oil from Flanagan, Illinois, to a major terminal in Cushing,

Oklahoma. From Cushing, the oil was to flow to refineries on the Gulf Coast and elsewhere. Enbridge designed the pipeline to run parallel to an existing pipeline, the Spearhead pipeline, which had been in operation since 2006.

Roughly four-fifths of Flanagan South would track within 50 feet of the existing Spearhead pipeline. Most of the 36"-diameter Flanagan South pipeline was to be buried at least four feet underground in trenches dug approximately ten feet wide and deep. As planned, the pipeline would pass underneath roads and streambeds and cross approximately 400 miles of farmland, 85 miles of forests, 68 miles of grasslands, 28 miles of developed land, and 10 miles of wetlands. Flanagan South's construction would require grading, excavation, or other forms of earth-disturbing activities in order to erect, inspect, and maintain the pipeline itself and its supporting infrastructure, such as pumping stations, mainline valves, pipe yards and access roads. The construction activities would affect swaths of land as wide as 135 feet, and ongoing maintenance would use a permanent 50-foot-wide right of way, kept clear by cutting back vegetation every three to five years and possible application of herbicides. Of the sixty eight miles of access roads anticipated for the pipeline, roughly seven miles would be newly constructed, with most of the new roads crossing non-forested, agricultural areas not requiring tree removal.

Enbridge budgeted more than $2.5 billion to build Flanagan South and sought to complete construction by June 2014, only ten months after breaking ground. Before starting construction, Enbridge negotiated rights of way across approximately 2,400 tracts of land owned by approximately 1,700 private landowners. The company conducted public outreach campaigns and solicited input from local officials, Indian nations, community groups, and landowners expected

to be affected by the project. Enbridge also sought regulatory authorizations from local and state governmental entities, as well as federal agencies.

The parties do not dispute that, to complete construction of the pipeline, Enbridge required easements from the Corps and the Bureau to cross spans of federal and Indian lands, and Clean Water Act approvals from the Corps to conduct dredge and fill activities at water crossings. The parties also recognize that, in granting those permissions, the Corps and Bureau were required to consult with the U.S. Fish and Wildlife Service (the Service) pursuant to Section 7 of the ESA regarding the harm to endangered or threatened species anticipated to result from those permissions. They further recognize that Enbridge could not lawfully harm listed species unless it obtained either a safe harbor from the Section 7 consultation process, *see* 16 U.S.C. § 1536, or a permit under Section 10 of the ESA, *see id.* § 1539, discussed below.

Enbridge urged the agencies to act quickly so that it could meet its construction deadlines, and the agencies did so. Enbridge obtained Clean Water Act verifications from the Corps for the pipeline to make water crossings, as well as easements from the Corps and the Bureau to cross federal and Indian lands. The Corps and Bureau also consulted with the Service pursuant to ESA Section 7 regarding their approvals' potential impact on listed species, and the Service issued a Biological Opinion regarding the Flanagan South project's anticipated impact.

The Biological Opinion concluded that building and operating Flanagan South would likely result in some "take"—*i.e.*, harming or killing—of two listed, endangered species, the Indiana Bat and the American Burying Beetle, but that the take would not be so extensive as to jeopardize the

continued existence of either species.[2]  The Biological Opinion contained an Incidental Take Statement (ITS) that identified reasonable and prudent measures, chiefly habitat restoration and monitoring measures, by which Enbridge could minimize the anticipated take of the two species that would occur incidental to the project, and set forth mandatory terms and conditions to that end.  The ITS provided Enbridge a conditional safe harbor from liability under the ESA for any taking of listed species, but that permission was limited:  By its own terms, it was valid only insofar as the Corps or Bureau imposed the ITS on Enbridge by incorporating it as a binding, enforceable term of permits or contracts they issued to Enbridge to which Enbridge in fact adhered.  The easements that the Corps and Bureau granted to Enbridge did not purport to incorporate and enforce the ITS, and the Corps's verifications did so only within the geographic segments of the Corps's Clean Water Act jurisdiction over the verified water crossing areas.  Enbridge considered but decided against applying to the Service for a Section 10 permit to take species, instead of or in addition to obtaining the safe harbor resulting from the verifications' incorporation of the Section 7 ITS.

The Corps conducted a NEPA analysis when it reissued Nationwide Permit 12, *see* 77 Fed. Reg. 10,184, 10,197 (Feb.

---

[2] The Indiana bat is a medium-sized migratory bat found in the eastern United States that faces threats to its habitat for hibernation, roosting, forage, migration and swarming.  It has been listed as an endangered species since 1967, when it was originally listed under the Endangered Species Preservation Act of 1966, a predecessor to the ESA.  32 Fed. Reg. 4,001 (Mar. 11, 1967).  The American Burying Beetle is a uniquely large, colorful beetle, found chiefly in a few central states, whose numbers have been depleted due largely to the fragmentation of its habitat.  It has been listed as endangered since 1989.  54 Fed. Reg. 29,652 (July 13, 1989).

21, 2012), and the Corps and the Bureau each completed geographically limited NEPA analyses in conjunction with the easements they granted. No agency performed a NEPA analysis of the full Flanagan South project.

### B. NEPA's Environmental Review Requirement

NEPA requires the federal government to identify and assess in advance the likely environmental impact of its proposed actions, including its authorization or permitting of private actions. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004). NEPA's mandate, which incorporates notice and comment procedures, serves the twin purposes of ensuring that (1) agency decisions include informed and careful consideration of environmental impact, and (2) agencies inform the public of that impact and enable interested persons to participate in deciding what projects agencies should approve and under what terms. *Id.* at 768. The statute serves those purposes by requiring federal agencies to take a "hard look" at their proposed actions' environmental consequences in advance of deciding whether and how to proceed. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989). The statute does not dictate particular decisional outcomes, but "merely prohibits uninformed—rather than unwise—agency action." *Id.* at 351; *see also Pub. Citizen*, 541 U.S. at 756-57.

At the heart of NEPA is the procedural requirement that federal agencies prepare and make publicly available, in anticipation of proposed "major Federal actions significantly affecting the quality of the human environment," an Environmental Impact Statement (EIS) that assesses the action's anticipated direct and indirect environmental effects, and that the agencies consider alternatives that might lessen any adverse environmental impact. 42 U.S.C. § 4332(C); 40

C.F.R. § 1508.11. Regulations promulgated by the Council on Environmental Quality (CEQ) provide common guidance for all federal agencies in carrying out their NEPA responsibilities. *Pub. Citizen*, 541 U.S. at 757; *see* 40 C.F.R. pts. 1501-02. Some agencies, such as the Corps, have promulgated their own, complementary NEPA regulations in order to provide additional guidance to their personnel to carry out the directives of the statute and the CEQ regulations in agency-specific contexts. *See, e.g.*, 33 C.F.R. § 325 App. B (Corps regulations); *see also* 40 C.F.R. § 1500.2(a)-(b).

The CEQ regulations explain that NEPA's "federal actions" may encompass the federal government's own undertakings, such as promulgating a rule or building a public project, as well as government authorizations or support of non-federal activities, such as approving private construction activities "by permit or other regulatory decision." 40 C.F.R. § 1508.18(a), (b)(4). The CEQ regulations clarify that the term "major" "reinforces but does not have a meaning independent of significantly," 40 C.F.R. § 1508.18, and explain that interpretation of the term "significantly" entails case-by-case consideration of the context of the action and the severity of its impact, *id.* § 1508.27.

When it is uncertain whether a proposed federal action will "significantly affect" the environment so as to require an EIS, the regulations call for the agency to prepare an Environmental Assessment (EA)—essentially, a preliminary consideration of potential environmental effects in a "concise public document" designed to "provide sufficient evidence and analysis for determining whether" an EIS is needed. *Id.* §§ 1501.4(b)-(c), 1508.9; *see Pub. Citizen*, 541 U.S. at 757-58. If, informed by the EA, the agency finds no need for an EIS, it must prepare a "finding of no significant impact" (FONSI) that includes or summarizes the EA and briefly

explains why the agency believes the action will not have a significant effect on the environment. 40 C.F.R. §§ 1501.4(e), 1508.13. For example, the EAs performed by the Corps and the Bureau in this case assessed the anticipated environmental effects—on soil, water, species, air quality, noise, and cultural resources—of granting Enbridge's requested easements to run Flanagan South across the federal lands. The agencies' EAs resulted in a FONSI for each easement. Each form of NEPA analysis—EA/FONSI or EIS—requires public notice and comment, *id.* §§ 1503.1, 1501.4(e), 1506.6, and each is subject to judicial review, *see, e.g.*, *Pub. Citizen*, 541 U.S. at 763-64; *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340-42 (D.C. Cir. 2002).

Sierra Club's objection in this suit concerns the scope, not the intensiveness, of the agencies' analyses. That is, Sierra Club does not complain that an agency improperly prepared an EA and issued a FONSI when it should have prepared an EIS. Rather, it complains that no agency ever conducted pipeline-wide NEPA analysis to any degree, whether an EA or an EIS.

Sierra Club identifies three groups of federal agency approvals that, it contends, support its claim that federal law requires a pipeline-wide NEPA analysis of the Flanagan South project: (1) easements granted by the Corps and the Bureau for the pipeline to span two parcels of federally owned riverside land and 34 parcels of federally managed Indian lands; (2) Clean Water Act verifications issued by the Corps concluding that 1,950 water crossings complied with the Clean Water Act under Nationwide Permit 12; and (3) conditional permission for Enbridge to take endangered species in the course of constructing and maintaining the pipeline without incurring liability under the ESA—permission provided through an Incidental Take Statement,

issued by the Service and implemented by the Corps in its verifications. Sierra Club contends that those actions triggered a requirement under NEPA that one of the agencies review the environmental impact of the entire pipeline, including portions outside the segments that the federal actions purported to address.

### 1. Easements Across Federal or Indian Lands

Both the Corps and the Bureau granted Enbridge easements to cross federal and Indian lands. *See* 30 U.S.C. § 185(a) (authorizing agencies to issue rights of way for transportation of oil and gas across federal lands); 25 U.S.C. § 321 (authorizing the Department of the Interior to issue rights of way for oil and gas transportation across Indian lands). The Corps easements allowed the pipeline to cross 1.3 miles of land in two parcels owned by the federal government along the Mississippi and Arkansas Rivers. The Bureau easements afforded rights of way across 34 tracts, or 12.3 total miles, of Indian lands the Bureau manages in trust for tribes. The Corps and Bureau prepared three discrete NEPA analyses, in the form of EAs, to consider the anticipated environmental effects of granting Enbridge rights to construct segments of the pipeline across those lands. Each analysis considered only the environmental impact anticipated within its respective geographic area.

### 2. Clean Water Act Verifications Under Nationwide Permit 12

The next category of federal actions involved verifications by the Corps, which authorized the Flanagan South pipeline to cross minor waterways consistent with the Clean Water Act. The Corps has responsibility for implementing the provisions of the Act relevant here, including by requiring permits for construction activities that

involve dredge and fill of water features (including wetlands) subject to the Act's jurisdiction. *See* 33 U.S.C. § 1344. The Corps grants Clean Water Act permits in one of two ways: It issues individual permits that are tailored to specific projects, *id.* § 1344(a), or it promulgates general permits, such as Nationwide Permit 12, and later "verifies" that specific manifestations of a generally approved type of project, such as crossings by pipelines and other utility lines, qualify thereunder, *see id.* § 1344(e); *see also* Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184, 10,271-72 (Feb. 21, 2012).

General permits authorize categories of actions that will, alone and together, cause only minimal adverse environmental effects. 33 U.S.C. § 1344(e). They may extend to activities throughout a state, a region, or the nation; must be reevaluated at least every five years if they are to be reissued; and may contain general conditions applicable to all projects subject to approval thereunder. *See id.* Nationwide Permit 12 "addresses the construction, maintenance, repair, and removal of all utility lines throughout the nation," including lines "carrying resources (like water, fuel, and electricity), facilitating communication (like telephone lines, internet connections, and cable television), and removing waste." *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1058 (10th Cir. 2015); *see also* 77 Fed. Reg. at 10,271-72 (broadly defining "utility line" to include "any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance, for any purpose, and any cable, line, or wire for the transmission for any purpose of electrical energy, telephone, and telegraph messages, and radio and television communication"). There is no dispute that the Flanagan South oil pipeline qualifies as a "utility line" under Nationwide Permit 12. Nationwide Permit 12 authorizes utility line construction activities that affect no more than a

half-acre of jurisdictional waters at any single crossing. *See* 77 Fed. Reg. at 10,271, 10,290.

After the Corps has promulgated a general permit, with public notice and an opportunity for a hearing, regional staff members consider requests for "verifications" of projects thereunder. For a project to qualify for verification under a general permit, a Corps District Engineer must conclude that it complies with the general permit's conditions, will cause no more than minimal adverse effects on the environment, and will serve the public interest. 33 C.F.R. §§ 330.1(e)(2), 330.6(a)(3)(i). Because the Corps cannot accurately anticipate the effects of thousands of future activities at the time it promulgates a general permit, the general permit's basic terms may later be supplemented by a Corps District Engineer's decision to attach additional, project-specific conditions at the verification stage. 33 C.F.R. §§ 330.1(e)(2), 330.6(a)(3)(i); *see also Ohio Valley Envtl. Coal. v. Bulen*, 429 F.3d 493, 501 (4th Cir. 2005). If a District Engineer deems a project inappropriate for verification under a general permit, the engineer may require that the project instead proceed under an individual permit. 33 C.F.R. § 330.6(a)(2), (d).

In this case, four regional Corps offices each issued verifications of the Flanagan South project for their respective regions under Nationwide Permit 12. The 1,950 crossings the Corps verified here collectively comprise about 13.7 miles, or roughly 2.3 percent, of the Flanagan South pipeline's 593-mile route. The Corps did not require any separate permits. It did, however, impose conditions on the verifications to ensure compliance with the Endangered Species Act, as contemplated by the Clean Water Act's minimal-adverse-impacts requirement.

The Corps performed a NEPA analysis when it promulgated Nationwide Permit 12, and Sierra Club does not here challenge the adequacy of the Corps's analysis at that stage. *See* 77 Fed. Reg. at 10,187. The Corps did not conduct any further NEPA analysis of its verifications of Flanagan South under the nationwide permit. The Corps's practice is to perform NEPA analysis for general permits in advance of their promulgation, and not to conduct additional NEPA analysis when it verifies specific activities under the general permits. *See, e.g.*, *Bostick*, 787 F.3d at 1054;[3] *Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs*, 683 F.3d 1155, 1158 (9th Cir. 2012). The Corps represented to this court that it is very common for domestic oil pipelines to be constructed without any whole-pipeline NEPA analysis, and estimates that 180 oil pipelines have been constructed primarily over private lands without analysis of the environmental effects of the pipeline as a whole.

### 3. Endangered Species Act Consultation and Authorization

The third type of federal action at issue is the conditional, limited authorization of the Flanagan South pipeline under the Endangered Species Act. Following interagency consultation required by Section 7 of the ESA in connection with federal agency actions, the Service issued and the Corps implemented

---

[3] For thoughtful analysis of the scope of the Corps's obligations under NEPA, see *Bostick*, 787 F.3d at 1062 (McHugh, J., concurring). To the extent that the Corps, both in *Bostick*, *see id*. at 1062-63, and in this case, *see* Oral Arg. Rec. (Apr. 9, 2015) 30:20-31:37, understood its NEPA obligations as confined to considering environmental effects on CWA jurisdictional waters, its view misapprehends the obligations of any agency taking action subject to NEPA to do a comprehensive analysis of all types of foreseeable environmental effects. *See* 40 C.F.R. §§ 1508.8, 1508.27.

an Incidental Take Statement to minimize the project's impact on two endangered species, the Indiana Bat and the American Burying Beetle, and to authorize incidental take of those species.

When Congress enacted the ESA, it "intended endangered species to be afforded the highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978); *see generally* 16 U.S.C. § 1531. The ESA generally prohibits the "take" of any members of endangered animal species, defining "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. §§ 1532(19), 1538(a)(1)(B). Notwithstanding that prohibition, private parties such as Enbridge may obtain authorization for incidental take of species where the take is not the project's objective and is sufficiently limited that it does not jeopardize the survival of the species. *See id.* §§ 1536(a)(2), 1539(a)(2)(B). A party may obtain such limited permission for the incidental take of species in either of two ways.

First, a party may apply to the Service for a permit under Section 10 of the ESA, and the Service may issue a permit directly to that party to take members of listed species "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." *Id.* § 1539(a)(1)(B); *see, e.g.*, *Gerber v. Norton*, 294 F.3d 173, 175 (D.C. Cir. 2002) (Service issuing Section 10 permit to a developer to take endangered fox squirrels incidental to constructing a residential housing project). A Section 10 permit application must include a conservation plan that specifies the likely impact of the anticipated take as well as steps for minimizing and mitigating such impact (with identified funding sufficient to implement those steps), and that identifies which potentially less harmful alternatives were

considered and why they are not being used. 16 U.S.C. § 1539(a)(2)(A). Enbridge considered and decided against seeking a Section 10 permit, as detailed below.

Second, and less directly, a private party may take listed species by complying with an ITS issued by the Service pursuant to ESA Section 7. Section 7 requires other federal agencies to consult with the Service whenever they have reason to believe that listed species or critical habitats may be affected by their planned actions, including authorizations of private parties' actions. *Id.* § 1536(a). Accordingly, in this case the Corps and the Bureau, as "action agencies," consulted with the Service in light of the Clean Water Act verifications that the Corps was issuing and the easements that both agencies were granting to Enbridge. *See id.*; *see generally* U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., Endangered Species Consultation Handbook (March 1998) (hereinafter "Section 7 Handbook"), http://www.fws.gov/endangered/esa-library/pdf/ esa_section7_handbook.pdf. The Service allows private parties to participate in a Section 7 consultation when the contemplated action involves the action agency's approval of private-party conduct, *see* 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14, and Enbridge actively participated in the ESA Section 7 consultation relating to Flanagan South.

In a Section 7 consultation, the Service prepares a Biological Opinion identifying the project and any likely impact on listed species or their habitat. 16 U.S.C. § 1536(a)-(c); 50 C.F.R. §§ 402.02, 402.14(e), (g)-(h). The Service cannot approve proposed actions that are likely to jeopardize the continued existence of listed species or critical habitats. 16 U.S.C. §§ 1536(a)(2), (b)(4). If an action will likely result in at most a limited take that is incidental to the project, the Service provides the consulting agency and private party with

an ITS as part of the Biological Opinion. *Id.*; 50 C.F.R. § 402.14(i). An ITS identifies reasonable and prudent measures—such as mitigation, monitoring, and reporting—necessary or appropriate to minimize the impact on species likely to be incidentally affected by the project, and terms and conditions required to implement those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(ii), (iv); *see, e.g.*, *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 597-99 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 948 (2015).

It is up to an action agency that has consulted with the Service under Section 7 to determine whether and how to proceed with its proposed action (including permitting private activity) in light of an ITS issued by the Service. 50 C.F.R. § 402.15(a); *see* 16 U.S.C. § 1536(b)(4). However, the action agency and private party (unless it has obtained a Section 10 permit) must comply with the Service's ITS if they wish to be insulated from ESA liability for taking species incidental to the project. 16 U.S.C. § 1536(*o*)(2); 50 C.F.R. § 402.14(i)(5); *see, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 169-70 (1997).

In this case, the Service consulted with the Corps and the Bureau, and Enbridge participated. The agencies and Enbridge negotiated for more than a year over several questions, including whether Enbridge would seek a Section 10 permit or a Section 7 ITS; whether the Biological Opinion and its ITS would cover only the verification and easement areas or the whole Flanagan South project; and the geographic extent to which the Corps was responsible for incorporating the ITS in its verifications and enforcing it outside those jurisdictional areas. The Service ultimately prepared a Biological Opinion that examined the entire length of the pipeline. *See* 50 C.F.R. § 402.02 ("Action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action.").

Neither the Service nor the Corps or Bureau prepared any NEPA analysis of the issuance or implementation of the ITS.

The Service determined that, if Enbridge took certain mitigation measures and performed onsite monitoring for five decades, the project would result in a tolerable degree of incidental take of the two identified endangered species and their critical habitat. The Service so specified in the ITS it issued pursuant to Section 7. If the ITS were made a binding condition of a contract, permit, lease or easement, and Enbridge complied with those terms and conditions, the ITS specified that it would provide Enbridge a safe harbor from ESA liability for incidentally taking those species within the geographic scope of any area in which Enbridge was bound to, and did, comply.

## C.  Procedural History

Sierra Club filed suit against the Corps in August 2013, on the day Enbridge began construction of Flanagan South. The organization amended its complaint soon thereafter to add new claims and name new federal-agency defendants. The amended complaint asserted that NEPA analysis was required in light of requested easements over federal lands, Clean Water Act verifications, and the issuance of the ITS. Sierra Club claimed that those actions, "individually and collectively, constituted major federal action that triggered defendants' NEPA obligations" to prepare NEPA analysis of "the entire Project." Compl. ¶ 5. Sierra Club contended that a "massive pipeline has been authorized . . . without any NEPA review of the extensive environmental impacts of the entire pipeline." *Id.* ¶ 7.[4] Sierra Club also asserted a Clean

---

[4] Sierra Club also alleged that the agencies failed to designate a "lead agency," preferably the Corps, to oversee the NEPA analysis. Compl. ¶¶ 40, 187; *see* 40 C.F.R. § 1501.5(c).

Water Act claim against the Corps, alleging that the verifications the Corps issued under Nationwide Permit 12 were unlawful because, as relevant here, the agency failed to evaluate the pipeline's cumulative impacts. *Id.* ¶ 192. Sierra Club asserted its NEPA and Clean Water Act claims in conjunction with the Administrative Procedure Act, seeking a declaration that the alleged federal actions were all unlawful and an order "enjoining Enbridge from conducting any activities in reliance on" them.

Sierra Club moved for a preliminary injunction, Enbridge intervened as a defendant, and the district court denied preliminary relief. Later, on cross-motions for summary judgment, the district court ruled in favor of the defendants, observing that the agencies had "permitting authority over only small segments of this private pipeline project and none of the defendant agencies, alone or in combination, ha[d] authority to oversee or control the vast portions of the [] Pipeline that traverse private land." *Sierra Club v. Army Corps of Eng'rs*, 64 F. Supp. 3d 128, 133-34 (D.D.C. 2014). The court also ruled against Sierra Club on its Clean Water Act claim, holding that the Corps lawfully conducted region-based analyses of the adverse cumulative effects of the water crossings it verified under Nationwide Permit 12. *Id.* at 155-57. On the same day that it entered summary judgment, the district court entered a separate order denying Sierra Club's two pending motions to supplement and amend its first amended complaint. Sierra Club timely appealed.

## II. Mootness

At the threshold, we must confirm our subject matter jurisdiction. *North Carolina v. Rice*, 404 U.S. 244, 246 (1971). Enbridge contends that, as a prudential matter, we should dismiss this appeal as moot because the agencies have

already granted the various authorizations at issue and construction of the pipeline is now complete. In Enbridge's view, the court cannot now remedy any injuries that might stem from the claimed NEPA violations because NEPA's goal of requiring the federal government to study and publicly explain anticipated environmental effects before taking action would not be furthered by post-construction NEPA review. At this point, Enbridge argues, there is "no real opportunity for any of the Defendants to reconsider their decisions," and "any further public comment could have no impact on the Defendants' decision-making, since the agencies could not effectively act on the input provided." Enbridge Br. 13, 16. Enbridge likewise argues that Sierra Club's Clean Water Act claim is moot because "the minimal impacts to jurisdictional waters under [Nationwide Permit 12] at stake in this litigation have already occurred" and "[t]here are no ongoing unmitigated impacts." *Id.* at 16-17.

This case is not moot because an order wholly or partly enjoining operation of the pipeline, pending further analyses of the pipeline's environmental impact, would provide some degree of "effectual relief." *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12-13 (1992). "Even though it is now too late to prevent or to provide a fully satisfactory remedy for" the harms Sierra Club identifies, the court has the "power to effectuate a partial remedy," and that "is sufficient to prevent this case from being moot." *Id*. at 13. "[T]his case presents a live controversy" because, were this court to hold that the agencies' NEPA analysis was inadequate or their decisions otherwise arbitrary and capricious, they "would have to correct the decision-making process." *Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 591 n.1 (9th Cir. 1981). If the NEPA analysis were legally inadequate, "we could order that the [pipeline] be closed or impose restrictions on its use," at

least on federally authorized segments, "until [the agencies] complied with NEPA." *Airport Neighbors All., Inc. v. United States*, 90 F.3d 426, 429 (10th Cir. 1996).

More extensive environmental analysis could lead the agencies to different conclusions, with live remedial implications. If a broader NEPA analysis uncovered additional environmental harms, the removal of the challenged project, at least from certain areas, "could be required." *Schlesinger*, 643 F.2d at 591 n.1. Even assuming claims "relating to the *construction* of" the pipeline were moot, "we still may consider whether [the agencies] complied with NEPA by adequately addressing the environmental impacts resulting from the enhanced *use* of" it. *Airport Neighbors All.*, 90 F.3d at 429. The agencies could call for additional mitigation and monitoring, or could decide not to renew their respective authorizations. *See, e.g.*, 33 C.F.R. § 330.5(d). There is no basis for Enbridge's contentions that none of the types of environmental effects that agencies must investigate under NEPA could be avoided, undone, or more robustly mitigated and monitored.

This case is thus distinguishable from those in which the court could not provide any of the relief sought. In *Sierra Club v. U.S. Army Corps of Engineers*, for example, environmental challenges to the Corps filling wetlands to construct a sports complex were moot once the construction was fully completed because it was undisputed that the wetlands could not be restored, and the wetlands were the only resource in which the plaintiffs claimed an interest. 277 F. App'x 170, 173 (3rd Cir. 2008). The completion of the project and the limited nature of the plaintiffs' asserted interest in that case eliminated "the opportunity for *any* meaningful relief to Plaintiffs' alleged injuries." *Id.* (emphasis added).

This case presents a live controversy, and we reject Enbridge's suggestion that we dismiss the appeal for prudential reasons. That conclusion comports with Congress's objective in the various federal laws at issue here that require environmental review and authorization in advance. "If the fact that [projects] are built and operating were enough to make [a] case nonjusticiable," agencies and private parties "could merely ignore the requirements of NEPA" as well as other statutes requiring pre-construction authorization or review, "build [their] structures before a case gets to court, and then hide behind the mootness doctrine." *Schlesinger*, 643 F.2d at 591 n.1. But "[s]uch a result is not acceptable." *Id.*; *see also West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 925 (9th Cir. 2000). We thus proceed to the merits of Sierra Club's challenge.

## III. NEPA

Sierra Club contends that the agencies should have conducted NEPA review of the pipeline as a whole. The only alleged federal action that, by its terms, addressed the entire pipeline was the Service's ITS in its Biological Opinion. Sierra Club argues that either the Service's issuance of the ITS during Section 7 consultation with the Corps and Bureau, or the Corps's implementation of the ITS as a condition of the Clean Water Act verifications it issued to Enbridge, constituted federal action encompassing all of Flanagan South, thereby mandating whole-pipeline NEPA review. The Bureau also consulted with the Service in light of the easements it was granting to Enbridge, but Sierra Club does not invoke the Bureau or its easements in arguing that the ITS triggered NEPA—perhaps because the easements, unlike the Corps's verifications, contained no explicit terms implementing the ITS.

We conclude, on the facts of this case, that the Service's issuance of the ITS was not, standing alone, federal action triggering NEPA review. By contrast, the Corps's implementation of the ITS as a condition of its Clean Water Act verifications was federal action, but with geographic scope far more limited than the NEPA review Sierra Club seeks. In advocating for review of the entire pipeline, Sierra Club unsuccessfully invokes the doctrine against impermissible segmentation of NEPA review in an effort to trigger NEPA's connected- and cumulative-actions doctrines and the Corps's agency-specific NEPA regulations. Sierra Club did not preserve a claim for NEPA analysis limited to the verification and easement areas, so we have no occasion to consider it. We must therefore reject Sierra Club's NEPA arguments on appeal.

### A.  Implementation of the ITS as Federal Action

An ITS, as explained above, is a set of terms and conditions that the Service provides under Section 7 of the ESA to other federal agencies planning actions likely to affect listed species. In this case, Section 7 required the Corps and the Bureau—action agencies—to consult with the Service and the Service to render a Biological Opinion regarding the Corps's anticipated Clean Water Act verifications and the Corps and the Bureau's grants of easements. *See* 16 U.S.C. § 1536; 50 C.F.R. § 402.14. The Biological Opinion examined the entire Flanagan South project and set forth in the ITS measures to mitigate, monitor, and report take of endangered species incident to the project. The Corps implemented the ITS in its Clean Water Act verifications, although only to a limited geographic extent. Compliance with the ITS, insofar as action agencies made it binding and enforceable, provided Enbridge with a safe harbor from ESA liability.

The Service's development and issuance of the Section 7 ITS, standing alone, was not federal action. But, as explained below, the Corps's implementation of the ITS was federal action, albeit of confined scope. An agency's advice to another agency on how that agency should proceed with its permitting actions does not amount to federal action under NEPA. The Service could, in a different context, be held to be an "action agency" for NEPA purposes. *See San Luis*, 747 F.3d at 644 (explaining that, in *Ramsey v. Kantor*, 96 F.3d 434 (9th Cir. 1996), the National Marine Fisheries Service, a consulting agency, also was an action agency when its conduct was, in substance, identical to the process for issuing a permit). But the record in this case makes clear that the Fish and Wildlife Service acted only in its consultative role, "merely offering its opinions and suggestions to [the Corps], which, as the action agency, ultimately decides whether to adopt or approve the [ITS]." *Id.* at 642. In that respect, the Service and the Corps's relationship here is analogous to that between the Service and the U.S. Bureau of Reclamation in *San Luis*, in which the Service had issued an ITS to Reclamation regarding the effect of a major water works project on the endangered Delta Smelt. *See id. at* 592. The Service's role in *San Luis* was to consult, and Reclamation was the action agency implementing the ITS. Here, similarly, it was the Corps's action, by way of adopting and incorporating the ITS in the verifications of Flanagan South's water crossings under the Clean Water Act, that qualified as federal action under NEPA. *See* 40 C.F.R. § 1508.18(b).

The Service was not obligated in *San Luis* or in this case to complete a NEPA analysis, because an agency need not complete such analysis "where another agency will authorize or implement the action that triggers NEPA." 747 F.3d at 644; *accord Miccosukee Tribe of Indians of Fla. v. United States*, 430 F. Supp. 2d 1328, 1335 (S.D. Fla. 2006). This

case is thus unlike *Ramsey*, in which the National Marine Fisheries Service issued a Biological Opinion and ITS and was, under the particular circumstances of that case, also the agency that authorized the species-taking action, thus making the Service's Section 7 ITS, standing alone, "functionally equivalent to a permit."  96 F.3d at 444; *see also San Luis*, 747 F.3d at 643-45 (distinguishing *Ramsey* on that basis).

The defendants are only partly correct that the ITS in this case was not the functional equivalent of a permit.  Agency Br. 44; Enbridge Br. 37, 39; *see also Sierra Club*, 64 F. Supp. 3d at 149-50 (drawing that conclusion).  The Service's issuance of the ITS was not the functional equivalent of a permit, but the Corps's incorporation of the ITS was.  When the Service issues an ITS in its consultative role, Enbridge correctly notes, it "do[es] not allow or authorize (formally permit) incidental take under section 7."  Enbridge Br. 38 (quoting Section 7 Handbook, *supra*, at x).  When the Service issues a Section 10 permit directly to a private party, it functions as an action agency.  Before it began construction, Enbridge considered applying to the Service for a private Section 10 permit.  Once the Service estimated that the Section 10 process could "take years to complete," Enbridge decided against the Section 10 route.  Enbridge instead opted only to participate in the speedier Section 7 process and settled for a much more limited authorization of anticipated take.  It was only when the Corps formally incorporated the ITS into its Clean Water Act verifications that it gave Enbridge permission to take species free from the threat of ESA liability.  The Corps-implemented ITS is the functional equivalent of a permit and thus constitutes federal action subject to NEPA.  *See* 40 C.F.R. § 1508.18(b)(4).  But because its permission is limited to the areas subject to the verifications, it is federal action of much more limited scope

than Sierra Club contends; contrary to Sierra Club's claim, it does not require NEPA review of the whole pipeline.

The district court concluded that the Corps's incorporation of the ITS in its verifications did not trigger NEPA because, the court reasoned, a verification is "not a major federal action in and of itself" and thus cannot be "transformed" into cognizable action on account of incorporating an ITS. *Sierra Club*, 64 F. Supp. 3d at 149. The court's conclusion was based in part on the assumption that the Corps had already made a "fully-informed decision to authorize certain activities . . . ex ante under the nationwide permitting system." *Id.* at 147. That assumption is unfounded in this context, however: Nationwide Permit 12 and Corps regulations make clear that the Corps did not assess effects on specific listed species when it authorized categories of actions through promulgation of the general permit; rather, it deferred any consideration of species impacts and authorization of species take until the verification stage, in the context of specific projects. *See* 33 C.F.R. § 330.4(f); 77 Fed. Reg. at 10,187; App. 327 (Decision Document for Nationwide Permit 12).

The defendants contend that the ITS, even as implemented by the Corps, did not constitute action triggering NEPA because its requirements are "modest" and "limited to monitoring." Agency Br. 46. They note that, under the regulations, "reasonable and prudent measures" that an ITS requires "cannot significantly modify the proposed action." *Id*.; *see* 50 C.F.R. § 402.14(i)(2). The defendants thereby seek to distinguish this case from those in which NEPA analysis is triggered by ITS conditions that "substantially modify" the action, Agency Br. 48, or "substantially alter the status quo," Enbridge Br. 43.

The defendants fail their own test. The "status quo" is not, as their argument assumes, a fully approved and constructed Flanagan South pipeline; rather, the baseline against which the significance of the federal action must be measured is no pipeline approved and no species killed or habitat disturbed. Authorizing take of endangered species in connection with pipeline construction and operation across jurisdictional waters, and doing so only on the conditions that Enbridge take mitigating conservation measures and monitor species impact for the anticipated useful life of the pipeline, was regulatory approval amounting to significant federal action requiring environmental review under NEPA. *See* 40 C.F.R. § 1508.18(b)(4); *see also San Luis*, 747 F.3d at 642-45; *cf. Tenn. Valley*, 437 U.S. at 172-73 (reflecting that, although "[i]t may seem curious to some that the survival of a relatively small number of three-inch fish . . . would require the permanent halting of a virtually completed dam for which Congress has expended more than $100 million," the plain language of the ESA "require[d] precisely that result").

## B.   Limited Scope of the ITS

The Corps's implementation of the ITS through its Clean Water Act verifications was federal action that required NEPA review, but the NEPA obligations arising out of that action extended only to the segments under the Corps's asserted Clean Water Act jurisdiction. The verifications purported to enforce the ITS against Enbridge only with respect to the water-crossing segments that the Corps verified under Nationwide Permit 12; they did not purport to permit any take of species (or authorize any other action, for that matter) outside those segments along the rest of the pipeline. Indeed, the Corps explicitly disclaimed that it would enforce compliance with the ITS with respect to the pipeline as a whole.

The record contextualizes and confirms the geographic limitation of the verifications' implementation of the ITS. The Corps, the Service, and Enbridge debated jurisdictional issues in the course of their Section 7 consultation. The Service and Enbridge sought a pipeline-wide ITS, while the Corps emphatically disclaimed responsibility outside the verification areas. Enbridge requested that the Corps consult with the Service under Section 7 "on the entire pipeline route instead of the areas tied to Corps jurisdiction/regulatory control," perhaps because it envisioned that would be tantamount to a shortcut Section 10 process. App. 402-403; *see also* App. 382. The Corps suggested that the Service issue a Section 10 permit covering non-Corps areas, but the Service responded that it could not do so because Enbridge had chosen not to apply for a Section 10 permit. App. 403. The Corps continued to maintain that it had authority over "a very small percentage" of the pipeline and that it would "only initiate Section 7 ESA consultation, as appropriate, for the limited activities associated with this project that it has sufficient control and responsibility to evaluate," noting the Service might "provide authorization for any take . . . outside of the Corps permit area under Section 10." *Id.*

The fact that the Service's Biological Opinion assessed the entire Flanagan South project does not undermine our holding concerning the limited scope of NEPA-triggering implementation of the ITS via the verifications. The ITS provided that "the Corps . . . must insure that the [ITS's measures] become binding conditions of any contract or permit issued [to Enbridge] to carry out the proposed action for the exemption in section 7(o)(2) to apply." App. 296. It further provided that the ITS's safe harbor could lapse if the Corps failed to "implement the terms and conditions" or "require any contracted group to adhere to the terms and

conditions of the [ITS] through enforceable terms that are added to the permit." *Id.*

The four regional Corps offices, in turn, issued verifications defining the limited scope of the ITS's "binding conditions," *see id.*, by "authoriz[ing] [Enbridge's] work . . . conditional upon [Enbridge's] compliance with the mandatory terms and conditions associated with the incidental take that may occur *within the Corps delineated permit areas*," App. 176 (emphasis added); *see* App. 385, 421 (other verifications with same language); *see also* App. 225-26 (biological opinion delimiting the Corps's jurisdictional areas as the verified water crossings and the two easements). The verifications reiterate that "[f]ailure to comply with the terms and conditions [of the ITS] *within the Corps permit areas* (i.e., separate and distant [sic: distinct] waterbody crossings, where work is verified by the Corps under Nationwide Permit Number 12), where take of the listed species occurs or adverse effects to designated critical habitat occurs, would constitute an unauthorized take, and it would also constitute non-compliance with your Corps permit." App. 176 (emphasis added). The verifications explicitly advised Enbridge that the ITS does not constitute authorization for Enbridge to take endangered species beyond the verified crossings. In particular, "in order to legally take a listed species," the Corps emphasized that Enbridge "must have separate authorization under the Endangered Species Act (e.g. an ESA Section 10 permit, or a Biological Opinion [] under ESA 7, with 'incidental take' provisions with which [Enbridge] must comply)." *Id.*

Sierra Club's claim for whole-pipeline NEPA analysis based solely on the ITS therefore fails because, per the terms of the ITS and the verifications themselves, the Corps had not bound Enbridge to comply with the ITS beyond those

segments of the pipeline subject to the Corps's Clean Water Act jurisdiction. Moreover, Enbridge did not obtain a Section 10 permit to take listed species on the balance of the pipeline outside the scope of the ITS-implementing verifications.

Given that NEPA-triggering federal action occurred with regard to the segments of the pipeline subject to the verifications by virtue of the ITS being incorporated with respect to those sections, we need not separately consider whether the Corps's verification of the pipeline's water crossings under Nationwide Permit 12, standing alone, would have required NEPA analysis. Even assuming the verifications, by themselves, did warrant NEPA analysis, the verifications do no more than the ITS to extend the geographic scope of the federal action; it remains limited to the verified segments.

## C. Failure to Preserve NEPA Claims for Less Than Whole-Pipeline Review

Sierra Club has failed to preserve its claim that the several easement actions, verifications and ITS, taken together, amount to a single federal action that requires its own NEPA analysis. We assume *arguendo* that the Corps's and Bureau's discrete easement actions and verifications incorporating the ITS were all component parts of the same federal action, but Sierra Club has failed to preserve an argument that the government was required to perform a unified NEPA analysis on anything less than the entire Flanagan South pipeline. As discussed below, Sierra Club has consistently argued only that some agency should have conducted a *pipeline-wide* NEPA assessment. In the district court, Sierra Club's contention that the easements, verifications, and ITS should have been considered together under NEPA was an intermediate step in its argument that

there should have been one, coordinated NEPA review that encompassed the balance of the pipeline—including sections not otherwise subject to federal review or authorization.

The district court record makes clear that whole-pipeline review was the only theory of NEPA deficiency that Sierra Club pursued. Sierra Club's claim that the agencies were required to assess the entire Flanagan South project underlay all the NEPA claims in its complaint. *See, e.g.*, Compl. ¶ 5 (objecting that the alleged actions "triggered Defendants' NEPA obligations," but "none of the Defendant agencies prepared either an [EA] or an [EIS] for the entire Project pursuant to NEPA"), ¶ 7 ("In short, . . . this massive pipeline has been authorized . . . without any NEPA review of the extensive environmental impacts of the entire pipeline . . . ."). In seeking preliminary relief, Sierra Club argued that the crux of its NEPA claims was that the federal government was obligated to scope a NEPA analysis to the entire pipeline.[5] The district court remarked in its preliminary injunction ruling that the gravamen of Sierra Club's NEPA claims was that the agencies had a collective obligation to perform environmental

---

[5] In its briefing in support of its motion for a preliminary injunction, Sierra Club contended that the "Flanagan South Pipeline is a major federal action" and framed the agencies' alleged NEPA violations as stemming from a failure to assess the impacts of Flanagan South as a whole. Mot. for Prelim. Inj., No. 1:13-cv-1239 KBJ (Sept. 4, 2013), ECF No. 14, at 13. Sierra Club repeatedly objected that no agency had prepared NEPA analysis scoped to the "entire" project. *E.g.*, *id.* at 5, 8, 19-21, 28, 38; Pls. Reply (Sept. 23, 2013), ECF No. 34, at 1-2, 7-10, 19-21. At the preliminary injunction hearing, too, Sierra Club underscored its position that "[t]he question is whether any federal agency has to look at the entire oil pipeline in its [NEPA analysis]." Tr. of Prelim. Inj. Hr'g (Sept. 27, 2013), ECF No. 91, at 11; *see also id.* at 12 ("The law. . . requires an agency to consider the entire [pipeline] . . . .").

review of the entire pipeline. *Sierra Club v. U.S. Army Corps of Engineers*, 990 F. Supp. 2d 9, 13 (D.D.C. 2013). Later, aware of the court's framing of its case, Sierra Club continued at the summary judgment phase to press the same theory exclusively.[6]

We will not reverse the judgment of the district court based on the argument, not advanced below, that an agency unlawfully failed to perform NEPA analysis on sections of Flanagan South short of the entire length of the pipeline. *See, e.g.*, *Potter v. District of Columbia*, 558 F.3d 542, 547 (D.C. Cir. 2009) (limiting our review to "only those arguments that were made in the district court, absent exceptional circumstances"). That claim is forfeited. Therefore, the only NEPA question preserved for our consideration is whether the federal actions of verifying the Pipeline's water crossings under Nationwide Permit 12, incorporating the ITS, and granting the easements to cross federal lands required NEPA analysis of the entire Flanagan South pipeline.

### D. Inapplicability of the Connected Actions, Cumulative Actions, and Corps-Specific NEPA Regulations

In contending that the federal actions within the verification and easement areas required the government also to assess the rest of the pipeline under NEPA, Sierra Club invokes the doctrines of "connected actions" and "cumulative actions" delineated in the CEQ regulations. *See* 40 C.F.R. §§ 1508.25(a)(1)-(2), 1508.7.[7] It also invokes Corps-specific

---

[6] *See, e.g.*, Pls. Mot. for Summ. J., No. 1:13-cv-1239 KBJ (Dec 9, 2013), ECF No. 61, at 2, 13, 15-16, 45; Pls. Reply (Jan. 27, 2014), ECF No. 75, at 1, 3, 7.

[7] Those regulations dictate the appropriate scope of EAs as well as EISs. *See Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1314

NEPA scoping regulations. *See* 33 C.F.R. § 325 App. B. None of those bases supports Sierra Club's claim.

**1.    Connected Actions.**    The connected actions regulation, on which Sierra Club relies most heavily, does not dictate that NEPA review encompass private activity outside the scope of the sum of the geographically limited federal actions.    The regulation provides, as relevant here, that "actions" must be analyzed together in the same assessment if they "[a]utomatically trigger other actions which may require environmental impact statements," "[c]annot or will not proceed unless other actions are taken previously or simultaneously," or if they are "interdependent parts of a larger action and depend on the larger action for their justification."    40 C.F.R. § 1508.25(a)(1).    The point of the connected actions doctrine is to prevent the government from "segment[ing]" its own "federal actions into separate projects and thereby fail[ing] to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper*, 753 F.3d at 1313.

*Delaware Riverkeeper* illustrates the connected actions regulation's anti-segmentation principle, and why it does not accomplish all that Sierra Club asks of it.  Under *Delaware Riverkeeper*, an agency cannot segment NEPA review of projects that are "connected, contemporaneous, closely related, and interdependent," when the entire project at issue is subject to federal review.  *Id.* at 1308.  In this case, the oil pipeline is undoubtedly a single "physically, functionally, and financially connected" project, but one in which less than five per cent is subject to federal review.  *See id.*  The Natural Gas Act requirement that natural gas pipelines be pre-certified for

_____

(D.C. Cir. 2014); *Grand Canyon Trust*, 290 F.3d at 346; *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1076 (9th Cir. 2002).

public convenience and necessity made the whole pipeline in *Delaware Riverkeeper* the subject of major federal action triggering NEPA. We held that FERC unlawfully segmented the requisite NEPA analysis by reviewing in separate portions a pipeline that "function[ed] together seamlessly." *Id.* at 1307, 1311. Here, the project is an oil pipeline, however, so not subject to any such overall pipeline precertification.[8] Sierra Club argues, in effect, that applying the connected actions regulation to the sum of other approvals Flanagan South did require draws into NEPA review the balance of the pipeline project that is not otherwise subject to agency action, thus subjecting it to the connected actions doctrine to the same extent as was the case in *Delaware Riverkeeper*. Sierra Club adds a step that the regulation does not support: The connected actions regulation requires agencies to review the picture as a whole rather than conduct separate NEPA reviews on pieces of an agency-action jigsaw puzzle; it does not add a multitude of private pieces to the puzzle and so require review of a much larger picture. That limitation is highlighted by the connected actions rule's lack of reference to private parties— a reference present in the cumulative action regulation, which directs agencies to consider the cumulative impact of action by an "agency (Federal or non-Federal) *or person*." *Compare* 40 C.F.R. § 1508.25(a)(1), *with id.* § 1508.7 (emphasis added). Background, private action is expressly encompassed in the cumulative action analysis in a way that it is not for connected action.

---

[8] Pipelines transporting oil within the United States are not subject to any general requirement of federal governmental evaluation and approval. In that way, oil pipelines are less regulated than natural gas pipelines, which must be supported by a certificate of public convenience and necessity from the Federal Energy Regulatory Commission before they may be built. 15 U.S.C. § 717f(c)(1)(A). *See Del. Riverkeeper*, 753 F.3d at 1307-10.

Sierra Club also invokes *Karst Environmental Education & Protection, Inc. v. EPA*, 475 F.3d 1291, 1296 (D.C. Cir. 2007), for the proposition that full-project NEPA review is required where federal agencies have substantial involvement in a private project such that it would not have been undertaken without the federal action. In *Karst*, we noted our dictum in *Macht v. Skinner*, 916 F.2d 13, 19 (D.C. Cir. 1990), approving of the Fourth Circuit's approach in *Maryland Conservation Council v. Gilchrist*, 808 F.2d 1039 (4th Cir. 1986), to the "federalization theory." *See Karst* 475 F.3d at 1296-97 (citing *Macht*, 916 F.2d at 14, 19). We went on in *Karst*, however, to observe that "we have no binding precedent adopting the federalization theory," and we did not there apply it. 475 F.3d at 1297. Indeed, *Macht*, too, came out the other way, undercutting *Sierra Club*'s argument. The rail project in *Macht* was not subject to whole-project NEPA analysis because federal agencies had regulatory control over "only a negligible portion of the entire project." 916 F.2d at 19. The same is true here.

Sierra Club offers no persuasive explanation why the portions of the pipeline outside the verification and easement areas constitute "federal actions" and thus "should be under consideration." *Del. Riverkeeper*, 753 F.3d at 1313. Rather, Sierra Club's more modest claim at oral argument was that *Delaware Riverkeeper* and the connected action regulation require that "the federal actions in this case—the easements, the other areas within federal jurisdiction—those are connected" and so should have been analyzed together. Oral Arg. Rec. at 7:33-40.[9] That is the accurate statement of the

---

[9] *See also* Oral Arg. Rec. at 7:57-8:11 (similar concession by Sierra Club, recognizing the same limited holding in *Hammond v. Norton*, 370 F. Supp. 2d 226 (D.D.C. 2005), upon which it also relies).

connected actions doctrine, but, as noted above, the claim resting on it was not preserved.

**2.    Cumulative Actions.**    The cumulative actions regulation is no more helpful to Sierra Club.  "Cumulative actions" are those that must be assessed together because they have "cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2).  A cumulative impact is that "which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7.  The cumulative actions doctrine is not concerned with geographic segmentation; if it were, it would be wholly redundant of the connected actions doctrine.  *See Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 70-71 (D.C. Cir. 1987).  Instead, it prevents agencies from ignoring the environmental effects of other actions, without regard to whether their author was federal, because those effects set the baseline state of affairs and thus the context in which the significance of proposed federal action must be evaluated.  An agency deciding whether to approve construction of a replacement airport, for example, must consider the prospective impact of the airport's added noise in the context of noise from other sources—including private sources not traceable to agency action.  *See Grand Canyon Trust*, 290 F.3d at 346.  Sierra Club's argument is not, however, that the agencies' NEPA analyses ignored the environmental impacts of cumulative actions on discrete swaths of the pipeline, but that they failed to analyze the entire length of the pipeline.  The cumulative actions doctrine therefore does not advance Sierra Club's case.

**3.    Corps Regulations.**  Appendix B of the Corps's agency-specific NEPA scoping regulations provides that when a party requires a Clean Water Act permit to conduct a

specific activity that is part of a larger project, the Corps's NEPA analysis should encompass not only the specific activity, but also "those portions of the entire project over which the [Corps] has sufficient control and responsibility." 33 C.F.R. § 325 App. B(7)(b)(1); *see also id.* § 325 App. B(7)(b)(2)-(3). Sierra Club asserts that the Corps had the requisite control and responsibility over all of Flanagan South, citing the Corps's jurisdiction over the verified water crossings and the easement areas. The agencies respond that Appendix B is categorically inapplicable to verifications (or easements). As they interpret the text, structure, and history of the Corps's Appendix B, it applies only to NEPA analysis triggered by issuance of individual Clean Water Act permits, as opposed to general permits and verifications thereunder.

We owe deference to the Corps's interpretation of its own NEPA regulations, *see, e.g.*, *Bostick*, 787 F.3d at 1054; *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 708 n.3 (6th Cir. 2014), and conclude that the Corps's interpretation of its own NEPA-implementing regulations in that regard is a permissible one, *see Bostick*, 787 F.3d at 1054; *cf. Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1121 (9th Cir. 2005) (consulting Appendix B for scope review based on an *individual* permit). As the Tenth Circuit has stated, "in adopting Appendix B, the Corps indicated that [it] would not apply to nationwide permits (or verifications of permit coverage)," as the "appendix was apparently designed to guide Corps officials in evaluating permit applications for individual projects." *Bostick*, 787 F.3d at 1054.[10]

---

[10] We hold today only that the agencies were not *required* to perform a pipeline-wide NEPA review; we do not opine on whether an agency lawfully could have conducted such a review, had it so chosen.

## IV. Clean Water Act

As detailed above, the Flanagan South pipeline makes approximately 1,950 discrete crossings of waters subject to the Clean Water Act, and those water crossings involved dredge and fill activity that required Enbridge to obtain authorization from the Corps of its compliance with the Act. Enbridge sought and obtained that authorization in the form of verifications issued by four regional offices of the Corps pursuant to Nationwide Permit 12. Sierra Club argues that the Corps regional offices' assessments of the cumulative effects of the water crossings verified under Nationwide Permit 12 were unlawfully narrow and conclusory. *See* 33 U.S.C. § 1344(e)(1); 33 C.F.R. §§ 330.1(e)(2), 330.6(a); 77 Fed. Reg. at 10,287. We review Sierra Club's Clean Water Act claim *de novo*, *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1150 (D.C. Cir. 2011), and hold that it lacks merit.

Sierra Club first faults the Corps for assessing cumulative effects on a regional basis, as opposed to a pipeline-wide basis. It relies on Nationwide Permit 12's instruction that the district engineer's decision shall "include an evaluation of the individual crossings . . . as well as the cumulative effects caused by *all of the crossings* authorized by the [Nationwide Permit]." 77 Fed. Reg. at 10,287 (emphasis added). That, Sierra Club asserts, means regional Corps staff must assess the water crossings across the entire pipeline. Sierra Club ignores, however, Nationwide Permit 12's explication that "cumulative effects are evaluated on a regional basis" and that "[c]umulative effects analysis may be done on a watershed basis, or by using a different type of geographic area, such as an ecoregion." *Id.* at 10,264.

Sierra Club also faults the Corps for what Sierra Club sees as inadequately explained conclusions. It asserts that the

District Managers merely parroted the language of the statute and the general permit at the end of each verification memorandum: "The proposed activity would result in only minor individual and cumulative adverse environmental effects and would not be contrary to the public interest." *E.g.*, App. 449. Such bare incantations, Sierra Club contends, provide no insight into how or on what basis the agency reached its decision.

As the district court recognized, however, the District Managers' conclusions were not unsupported boilerplate; they were "made at the end of a lengthy memorandum explaining, among other things, the details concerning the scope of the proposed project in each respective district, the expected effect of the project on [jurisdictional] waters . . . within that district, and specific mitigation techniques to be employed in response . . . ." 64 F. Supp. 3d at 157. In light of the surrounding context, we conclude that the Corps's cumulative effects conclusions were adequately supported and reasoned. *See Snoqualmie*, 683 F.3d at 1163.

## V. Motion to Supplement and Amend

Sierra Club also appeals the district court's order denying the organization's motions to supplement and amend its complaint. The defendants assert that Sierra Club failed to appeal that order, pointing out that Sierra Club's notice of appeal explicitly referred only to the district court's summary judgment order. The district court issued both orders concurrently, however, and we are satisfied that Sierra Club's notice of appeal adequately expressed its intent to appeal both orders. Further, the defendants suffer no prejudice from our consideration of the order denying the motions to supplement and amend. *See, e.g.*, *Martinez v. Bureau of Prisons*, 444 F.3d 620, 623 (D.C. Cir. 2006).

Reviewing the district court's denial of the motions to amend and supplement for an abuse of discretion, *Hall v. CIA*, 437 F.3d 94, 101 (D.C. Cir. 2006), we affirm the district court for substantially the same reasons explained in the challenged order. Sierra Club sought to add to its complaint allegations meant chiefly to show that the agencies had taken actions that, the agencies recognized, required NEPA review as to some portions of the pipeline. Specifically, Sierra Club sought to allege that the Corps and Bureau issued EAs for the easement areas—developments Sierra Club believed confirmed the ripeness of its NEPA claims and provided a stronger foothold for its arguments that the agency actions effectively federalized the entire pipeline. Sierra Club also sought to add allegations that EPA had commented to the Corps in December 2013 that the Corps's NEPA analysis of the Arkansas River easement was deficient because it failed to assess the entire pipeline.

The district court did not abuse its discretion in denying Sierra Club's motion as futile. As the court explained, its summary judgment analysis assumed that the grants of the federal easements were ripe federal actions triggering some degree of NEPA review. App. 633-34; *see also* 64 F. Supp. at 133 n.1. The completion of those EAs did not affect the NEPA inquiry before the court, which concerned only the *scope* of the NEPA analysis Sierra Club claims was required, not the intensiveness of that review. Sierra Club's own motion advised that the proposed newly styled claims and new allegations did "not involve any new . . . legal arguments that [were] not already before [the] court." And the existing claims concerned only the breadth, not depth, of the agencies' NEPA analysis. *See, e.g.*, Compl. ¶¶ 5, 7. The proposed supplement and amendment would not, for instance, have added a new claim that the agencies should have performed EISs rather than EAs on account of the easements. The

district court never had occasion to opine on such a claim, nor do we.

*   *   *

For the reasons stated, we affirm the judgment of the district court.

*So ordered.*

BROWN, Circuit Judge, *concurring in the judgment*: This is not a close case. As the district court aptly noted, three basic facts decide it: "a private company is constructing the [Flanagan South] pipeline largely on privately-owned land; the federal agencies that have been consulted about aspects of the pipeline project have control over only a small portion of the land and waterways that the pipeline traverses; and no statute authorizes the federal government to regulate or oversee the construction of a domestic oil pipeline." *Sierra Club v. U.S. Army Corps of Eng'rs*, 64 F. Supp. 3d 128, 157 (D.D.C. 2014). NEPA requires agency environmental review when the agency undertakes a major federal action defined as an action that significantly affects the human environment and is subject to federal control and responsibility. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.18; *see also Winnebago Tribe of Neb. v. Ray*, 621 F.2d 269, 273 (8th Cir. 1980) ("As for federal involvement, the fact that part of the line will cross the Winnebago Reservation does not suffice to turn this essentially private action into federal action. . . . Thus we conclude that the Corps did not have sufficient control and responsibility to require it to study the entire project."). Little more ink needs to be spilled to conclude that — given federal control over less than 20 miles of the 600-mile pipeline — NEPA cannot compel federal review of the entire, essentially private, pipeline.

Sierra Club has put forward several claims, all of them a variation on the theme that NEPA requires some federal agency, if not all of them collectively, to review the entire pipeline as a connected action. The likelihood of Sierra Club's success on the merits was briefed, argued, and thoroughly considered by the district court when it dismissed their motion for preliminary injunction. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 44 (D.D.C.

2013). After a second perusal when federal defendants[1] filed motions to dismiss and both parties cross-motioned for summary judgment, the district court again concluded that "[p]laintiffs are wrong to insist that any federal agency had an obligation under NEPA or any other statute to conduct an environmental review of the impact of the entire FS Pipeline . . . given that the Federal Defendants have permitting authority over only small segments of this private pipeline project and none of the defendant agencies, alone or in combination, have authority to oversee or control the vast portions of the FS pipeline that traverse private land." *Sierra Club*, 64 F. Supp. at 134.

The majority opinion retreads this familiar ground but with considerably more angst. This case is wholly removed from the contexts of *San Luis & Delta Mendota Water Authority v. Jewell*, 747 F.3d 581 (9th Cir. 2014), and *Ramsey v. Kantor*, 96 F.3d 434 (1996) — cases the opinion devotes several pages to distinguishing. *See* Maj. Op. 25-27. Here, no instance of federal involvement (alone or collectively) amounted to the "functional equivalent" of a permit nor was this a circumstance in which one federal agency was advising another. And no amount of artful pleading can convert these minor federal engagements into a "connected action" that subjects the 580 miles of *private* pipeline to NEPA review. *See Delaware Riverkeepers v. FERC*, 753 F.3d 1304 (D.C. Cir. 2014).

While the majority ultimately arrives at the same destination, its route is needlessly circuitous, creating the

---

[1] "Federal defendants" here refers collectively to the United States Corps of Engineers, the Department of Transportation Pipeline and Hazardous Materials Safety Administration, the Fish and Wildlife Service, the Department of Interiors Bureau of Indian Affairs, and the Environmental Protection Agency.

impression that Sierra Club's challenges fail by a hairsbreadth rather than a hectare.  Because I favor the district court's direct approach, I concur only in the judgment.